IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

SHAMGOD J. THOMPSON,

                          Petitioner,          **No. 06-CV-0254(RJA)(VEB)**
          -vs-                                 **REPORT and**
                                               **RECOMMENDATION**

DALE ARTUZ, Superintendent,

                          Respondent.

_____

## I.      Introduction

Petitioner *pro se* Shamgod J. Thompson ("Thompson" or "Petitioner") has filed a petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging the constitutionality of his

detention in state custody. This matter has been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b)(1) for the issuance of, *inter alia*, a report and recommendation regarding the disposition

of Thompson's petition. The Court is also authorized under the referral order to hear and decide

any non-dispositive motions.

Thompson is currently incarcerated pursuant to a judgment of conviction entered against

him on April 10, 2001, in Wayne County Court. The conviction stems from an incident that

occurred on the night of March 26-27, 2000, in the Newark-Geneva area of Western New York.

Petitioner, Rasheen Madison ("Madison") and Bryon Russ ("Russ") had given Robert Johnson

("Johnson") and Kevin Hobbs ("Hobbs") a ride to Newark, New York, from Geneva, New York,

in a Mercury Mountaineer SUV loaned to petitioner by his girlfriend, Torey Ronan ("Torey").

Just before dropping Hobbs and Johnson off, Petitioner and his cohorts robbed Hobbs of his

marijuana at gunpoint. After depositing Hobbs and Johnson unharmed at their destination, Petitioner, Madison, and Russ went on a quest for additional marijuana. As they had earlier discussed while Hobbs and Johnson were still in the car, a promising location was a house occupied by Rebecca Henrichon ("Henrichon"). Petitioner and his cohorts drove there and, armed with a small handgun and a machete, broke in. They assaulted and bound Henrichon; Madison threatened to rape her while Petitioner and Russ ransacked the apartment looking for drugs. Finding none, they took Henrichon's keys and a goldplated necklace.

During the robbery, Henrichon's boyfriend, Nelson Velasquez ("Velasquez"), came to the door. (Earlier that evening, Johnson (one of the robbery victims) had warned Velasquez that Henrichon might be robbed.) Petitioner and the other two perpetrators tied up Velasquez and stole his keys and a necklace.

When the Mountaineer S.U.V. was not returned, Torey's mother, Mrs. Ronan, reported it as stolen. A few days later, officers from the Brooklyn Police Department stopped the car and arrested its occupants, Petitioner and Madison. When the Ronan family reclaimed the car, they found, among other things, at least one set of keys that had been taken from Henrichon, a red bandanna, the red sweatshirt Petitioner had worn during the home invasion, and a tape dispenser bearing Madison's fingerprint.

The three defendants were subsequently arrested. Petitioner, along with Madison and Russ, was indicated by a Wayne County Grand Jury on multiple counts of burglary and robbery. Petitioner and Russ had a joint trial; Madison was tried separately. The jury returned a verdict convicting Petitioner of two counts of Burglary in the First Degree (New York Penal Law ("P.L.") §§ 140.30(3), (4)), two counts of Robbery in the First Degree (P.L. §§ 160.15(3), (4)),

and one count each of Burglary in the Second Degree (P.L. § 140.25(1)) and Robbery in the Third Degree (P.L. § 160.05).

Thompson was sentenced, as a second felony offender to determinate prison terms of 25 years each on the first-degree burglary and robbery counts; to a determinate 15-year prison term on the second-degree burglary count; and to an indeterminate term of from 3½ to 7 years on the third-degree robbery count. All sentences were set to run concurrently with each other.

All of Thompson's state-court post-conviction motions were unsuccessful, and this timely habeas petition followed. For the reasons that follow, the Court recommends that Thompson's petition be dismissed.

## II. Factual Background and Procedural History

### A. The Trial

What follows is a summary of the pertinent trial proof. Thompson's first two victims, Johnson and Hobbs, were friends who lived in Newark, New York. On the weekend of March 25-26, 2000, Hobbs and Johnson drove to Geneva to hang out with Thompson and his cohorts, Russ and Madison. T.277-79, 321-23. Hobbs and Johnson asked Thompson for a ride back to Newark on the night of March 26-27th. T. 279-80, 324. Petitioner was a driving a 1999 Mercury Mountaineer S.U.V. that he had "borrowed" earlier that day from Torey Ronan, a friend who was staying at Petitioner's apartment. T.606-07. However, Torey's mother, Sheryl Ronan ("Ronan"), was the actual owner of the S.U.V. T.586-87, 606.

On the drive from Geneva to Newark, Petitioner and his cohorts were discussing whether it would be worthwhile to rob a man named Brian Tyler ("Tyler") at gunpoint for his money and stash of marijuana. T.280-82, 324-25. Johnson had mentioned that Tyler had a stash of

marijuana.[1]Tyler lived with his girlfriend, Henrichon, on East Union Street in Newark. T.281.

Petitioner, Madison and Russ debated whether to restrain Tyler with tape while they burglarized

the home. T.326-28. Coincidentally, Hobbs and Johnson observed, on the drive to Newark, that

Madison was holding a black-handled, .25-caliber handgun. In addition, Johnson saw a machete

and a tape-dispenser containing tape in the Mercury Mountaineer. T.282, 325-26, 334.

When they arrived in Newark, they drove to a house at which Johnson and Hobbs had

cached a bag of marijuana under a rock. T.299, 328. Petitioner, Madison and Russ then relieved

Hobbs of his marijuana, with the assistance of a gun. T.303, 328.

Meanwhile, Velasquez (the third victim) was visiting with Henrichon and her two

toddlers at the house she shared with Tyler. T.345-46, 402.

After Petitioner and his associates had dropped off Johnson and robbed Hobbs, Johnson

proceeded to Henrichon and Tyler's house, and cautioned Velasquez to "be careful," because he

(Johnson) had heard that people might be robbing the home. T.330, 340, 402, 417.  Velasquez

did not tell Henrichon of a possible robbery. T.425.

At about midnight, and after Velasquez had spoken to Johnson, Henrichon asked

Velasquez to go out buy food for her. She gave him the keys to her car, and he went to

Wegman's to purchase an ice cream cake, and then dropped it off at Henrichon's house.  T.347,

403, 416. Still, Velasquez did not mention anything about a possible robbery. However, based

upon Johnson's tip, Velasquez took care to safeguard the two pounds of marijuana that he and

---

[1]        Johnson was convicted of fifth-degree conspiracy in 2000 (T: 331). When asked
about whether he had committed crimes in other counties, he asserted his Fifth Amendment right
against self-incrimination because he had not yet been sentenced in those matters (T: 332). He
testified that the District Attorney had agreed to "put in a note" for  Johnson with respect to
another matter, but that no other promises had been made (T: 331).

-4-

Tyler had earlier brought to Henrichon's home by returning it to Tyler's home. T.409, 417.

While Velasquez was performing this errand, Henrichon answered a knock at her door to find a young African-American male black (Madison) who asked her if she had any "weed." T.348. He repeated his question and then looked off to the side. T.348. Henrichon, sensing that something was amiss, began to close the door–however, the first man, followed by two other men wearing printed bandannas to conceal their faces, rushed the door, knocked her down, and dragged her to an upstairs bedroom where her daughter lay sleeping. T.348-50.

Henrichon had known Hobbs and Johnson for years, she knew that they were not among the intruders. T.349. The men switched on the lights in her children's bedrooms and brought Henrichon into her roommate's room. T.350. They forced her to lie face-down on the mattress, and the youngest attacker, Madison, placed his knee in her back and taped her legs, hands, nose and hair  with white or clear package tape (T: 350, 372-73).4 He told  Henrichon "I want to fuck you," but the others, who were looking through bureaus, closets and the beds and "ripping everything apart," stated that they just wanted to locate the "stuff" and leave (T: 350-51). The man whom Henrichon considered the "leader" of the gang wore a red sweatshirt bearing the words "New York" and had a small caliber, silver handgun which he held to Henrichon's head. T.351-52.  The third attacker held a machete to her throat. T.351-52. The men threatened to "pop a cap" in Henrichon. T.353.   The attackers cut the wires to the telephones in the house and tried to tie  Henrichon with the cords.  T.353.

In the meantime, at about 1:00 a.m., Mike Foss and Brian Tyler, friends of Henrichon and Velasquez, saw Velasquez driving in the area. T.432.  Velasquez asked Foss and Tyler to wait outside Henrichon's home while he dropped off Henrichon's car. T.432. While Foss and Tyler

waited in their car in Henrichon's driveway, they watched Velasquez walk up to Henrichon's

door, whereupon Velasquez was "yanked" into Henrichon's home. T.360, 403, 419, 432, 439. A

.22 or .25 caliber handgun was placed to Velasquez's head, and he was asked to hand over his

money and "weed". T.403, 406. When Velasquez told the robbers that he did not know where it

was, the men brought him to the back of the house. T.403. There Velasquez saw that telephone

cords had been pulled from the wall and dressers had been ransacked. T.413. The robbers took

Velasquez's silver chain, which bore a scorpion charm, and his house keys. T.405. He saw that

Henrichon had been tied up in the kitchen and was lying in front of the stove. T.361, 406.

The men asked Velasquez to tell them who was in the car parked outside. He replied that

Brian Tyler and Mike Foss were waiting for him. T.404. One of the attackers then went outside

and told Tyler and Foss to tell Velasquez (who was already in the home) to enter the

house, and he tried to convince the two men to enter the house as well. T.432. Tyler and

Foss, puzzled by the request because Velasquez was already in the house, both noticed

someone inside the house peek at them three or four times through the door. T.433. They

drove away, but passed Henrichon's house a few times. T.434. The men drove to a nearby

Dunkin' Donuts and called Henrichon's telephone number several times, but the telephone

was not answered and the answering machine did not retrieve the calls. T.434-35. \

Tyler and Foss drove again past Henrichon's home, and saw that the lights were on, so

Foss entered the house. T.435. Foss pulled telephone wire and tape from Henrichon, who was

crying. Foss described Velasquez as "hysterical". T.435. Foss returned to Tyler's car and they

drove back to the Dunkin' Donuts, where Sergeant Mark Thoms of the Newark Police

Department was purchasing coffee. T.436, 452. Foss told him that "a couple of black guys" had

broken into Henrichon's house. T.454. Sergeant Thoms followed them back to Henrichon's house. T.453-54. This was about 12:50 a.m.

Upon entering the house Sergeant Thoms saw wadded tape and telephone cord on the living room floor. T.455. He interviewed Henrichon and Velasquez, who were visibly upset. T.455-56. He recovered three telephones that had been ripped from the jacks; each telephone was damaged. T.460. The sergeant also recovered a machete from the floor of Henrichon's bedroom. T.463.

In the meantime, at about 1:30 a.m., New York State Trooper Mark Wing saw a 1999 Mercury Mountaineer parked at the gas pump of the Sugar Creek store in the town of Phelps. T.480-81. Because the car matched a recently-posted description, he stopped it as it entered the New York State Thruway. T.481-82. He and his partner interviewed the occupants: Petitioner, Bryon Russ, and Rasheen Madison, who gave the name Tony Jones. T.483, 491. Trooper Wing saw a machete sheath protruding about four inches from Russ' pants pocket, but he did not ask to examine it. T.485, 487. The men told the troopers that they were headed to New York City, and the troopers allowed them to drive away.

Petitioner had told his friend Torey Ronan earlier in the evening that he would return the Mountaineer in a half hour. T.607. Petitioner called her on March 27th to say that he would return the car early the following morning, but he failed to do so. T.609. Petitioner then called her a few more times that week, explaining that he was in Syracuse and Brooklyn and would eventually return the car. T.610. When petitioner failed to return it by March 31, 2000, Torey reported it stolen to the Geneva Police Department. T.610-11.

At 3:10 a.m. on April 1, 2000, Detective Alfred Williams of the New York Police

Department saw the Mountaineer parked in a "no standing" zone in Brooklyn. T.308-09. A computer check revealed that the vehicle had been reported stolen to the Geneva Police Department. T.309. The officers stopped the car and arrested its three occupants (Petitioner, Russ, and Madison, who again identified himself as Tony Jones). T.310-13, 492. The police found marijuana in the cup holder, but no weapons in the car. T.317.

Torey's mother, Sheryl Ronan, was notified by the New York Police Department that her car had been recovered so she, her husband, and Torey went to New York City to pick it up. T.317, 588-89, 611. On returning to their home in Ellenville, New York, Mrs. Ronan removed property that did not belong to them from the car and stored it in a box in the garage. T.589-90. Subsequently, Torey looked through that property and took any items that belonged to her. T.590. Among the items not owned by the Ronan family were a red bandanna, an "AAA plus" keychain, and a goldplated necklace. T.596-597. Torey recognized Petitioner's "racing jacket" among the items. T.411. Torey placed a "No. 1 Dad" keychain into the box of property. T. 619. Petitioner had given her that keychain; it was not found in the Mountaineer. T.623.

When the Ronan family traveled to New York City to retrieve the Mountaineer, Torey stayed in Manhattan for about a week. T.612. During that time, Petitioner paged her and told her to look under the cupholder of the Mountaineer. T.613. She did so when she returned to Ellenville, and found a small caliber, silver gun with a black handle. T.613-14. She called a friend, who retrieved the gun. T.614. Torey did not tell her parents about the gun. T.614.

Subsequently, on May 8, 2000, Mrs. Ronan spoke to Sergeant Randall of the Geneva Police Department. She complied with the sergeant's request that she mail all of the unfamiliar property, including the "No. 1 Dad" keychain, to the police department. T.563-64, 590-98.

At trial, Henrichon testified that the "No. 1 Dad" keychain had belonged to her roommate and was taken from the apartment during the robbery. T.359-60, 383. She testified that she did not know Torey Ronan. T.384.

The parties stipulated that Madison had given a statement to the prosecutor in which he admitted that he had identified himself as "Tony Jones" to Trooper Wing in Phelps and to Detective Williams in Brooklyn. T.491-92. Additionally, Madison's date of birth was August 23, 1981, but when he used the Jones name, he would give his birthdate as August 23, 1980 (T: 492).

Investigator John Clingerman of the Newark Police Department was assigned to investigate the invasion of Henrichon's home. T.493. On May 4, 2000, with Sergeant Randall, he interviewed Rasheen Madison T.494-95, 512, 560-61, 570. The interview began at noon and at about 1:10 p.m., Investigator Clingerman began to write out Madison's statement. T.495, 497, 522-23, 562. In Madison's signed statement, which was read at trial, he admitted that the three defendants had smoked the marijuana that they had stolen from Kevin Hobbs. T.500. Madison stated that during the robbery, a long silver chain bearing a scorpion piece had been stolen from the "kid on the floor". T.499. In addition, he admitted that they had stored a gun under the cupholder of the Mountaineer S.U.V. T.500.

Sergeant Randall delivered the boxes of property that he had received from Ronan to Investigator Clingerman. T.502, 568. Among the items were the "AAA plus" and "No. 1 Dad" keychains, a necklace, a red bandanna, a wallet containing a driving permit and New York State benefits card in petitioner's name, a multi-colored "Dupont" "racing jacket" and a red sweatshirt T.503, 565-68. The boxes also contained a tape dispenser. T.508. At Investigator Clingerman's request, Henrichon examined the property and identified the necklace and the "AAA plus"

keychain as hers, and the "No. 1 Dad" keychain as her roommate's keys. T.381, 503-08. Investigator Robert Hetzke of the Wayne County Sheriff's Department lifted a fingerprint from the handle of the tape dispenser, which matched Rasheen Madison's right ring finger. T.536-37, 543, 625-26, 628-31.

About one month after the incident, Kevin Hobbs met with Bryon Russ. T.284. Russ told Hobbs that he had learned, in a letter from "somebody," that Hobbs had "snitched on" Russ. T.284. Russ warned Hobbs that he would be "dealt with". T.284. Hobbs reported the threat to the police. T.284. He gave two statements to Investigator Clingerman, on April 12, 2000 and May 16, 2000, but the first statement, in which he told the investigator that he had never met petitioner, was untrue. T.288, 294. Hobbs explained that he initially lied to the police because he did not want to be involved in the investigation. T.302-03.

### 2. Petitioner's Case

Neither Bryon Russ nor Rasheen Madison presented evidence. Jacqueline Rowe ("Rowe") testified on Petitioner's behalf. Rowe, who was the mother of petitioner's child, testified that petitioner was with her at her mother's home between 11:15 p.m. and 1:10 a.m. on March 26th. T.639-44. She then dropped him off in Newark with her mother's van. T.641-42. Before they reached Newark, they drove through Geneva to look for petitioner's cousin, Madison; the men had planned to go to New York City later that night. T.641-42.

Rowe had been convicted in 1995 of third-degree grand larceny and had been twice convicted in 1999 of issuing a bad check. T.652. She was also convicted in 2000 of petit larceny and had used aliases in the past. T.653.

### 3. The Verdict and Sentencing

On February 20, 2001, the jury found petitioner guilty of two counts of first-degree burglary, two counts of first-degree robbery, one count of second-degree burglary and one count of third-degree robbery. The jury acquitted him of one count of first-degree burglary and one count of first-degree robbery. T.827-28. On April 10, 2001, following a hearing regarding the constitutionality of Petitioner's 1997 felony conviction in Kings County, he was adjudicated a second felony offender and sentenced to concurrent, determinate terms of 25 years on each of the first degree burglary and robbery counts; a concurrent, determinate 15-year term on the second degree burglary count; and a concurrent, indeterminate term of 3 ½ to 7 years on the third degree robbery count. On April 3, 2001, Bryon Russ received the same sentences as Petitioner. Rasheen Madison's sentence is not apparent on the record.

### 4.  Direct Appeal

Thompson's conviction was affirmed by the Appellate Division, Fourth Department, of New York State Supreme Court. *People v. Thompson*, 300 A.D.2d 1032 (App. Div. 4th Dept. 2002). Leave to appeal to the New York Court of Appeals was denied. *People v. Thompson*, 99 N.Y.2d 620 (N.Y. 2003).

### B.  The Federal Habeas Petition

In his petition, Thompson has asserted numerous of grounds for relief, which may be summarized as follows: (a) The trial court lacked jurisdiction over the case where, prior to indictment, a felony complaint was filed in the local village court; (b) The prosecutor used perjured evidence, insofar as Kevin Hobbs, during his initial meeting with Investigator Clingerman, failed to identify petitioner, and the prosecutor sought to "protect" the investigator by not presenting Kevin Hobbs' testimony to the grand jury; (c) Investigator Clingerman

tampered with the photo arrays and planted the "AAA plus" keychain in the box of property; (d) The prosecutor violated his *Brady* obligations by not disclosing that petitioner was not identified in photo arrays and by disclosing a redacted cell phone bill; (e) Petitioner was denied the right to compulsory process, in that petitioner was not permitted to present the testimony of witnesses who could attest to his alleged disability and alibi witnesses; (f) Prosecutorial misconduct insofar as the prosecutor introduced false "inferences" that the defendants had stolen the property contained in the box; (g) Ineffective assistance of trial counsel on the following grounds: (i) Counsel failed to investigate the viability of potential witnesses and did not call or subpoena alibi witnesses or present medical testimony; (ii) Counsel failed to object to Robert Johnson's invocation of his Fifth Amendment right against self-incrimination; (iii) Counsel failed to use the "misidentifications" of petitioner; (iv) Counsel failed to use exculpatory evidence at trial; namely, Henrichon's prior statements; (v) Counsel failed to challenge for cause two jurors; (vi) Counsel operated under a conflict of interest and he failed to move to recuse the trial judge; (vii) Counsel failed to move to have excess police officers removed from the courtroom; and (h) The verdict was against the weight of the evidence.

In his answer and memorandum of law in opposition to the petition, respondent concedes that all of Thompson's claims except one are exhausted. The only unexhausted claim, according to respondent, is Thompson's argument that trial counsel was ineffective in failing to move to have the trial court remove several police officers from the courtroom. Respondent also concedes that the petition is timely filed.

## III.  Applicable Legal Principles

### A.  Standard of Review

Federal habeas review is available for a State prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The Supreme Court has established beyond debate that mere errors of State law are not colorable grounds for Federal habeas relief. *See*, *e.g.*, *Estelle v McGuire*, 502 U.S. 62, 67-68 (1991); *Cupp v Naughten*, 414 U.S. 141, 146 (1970).

The Court's review of habeas petitions filed pursuant to 28 U.S.C. § 2254 is governed by standards set forth in the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214. *E.g.*, *Brisco v. Ercole*, 565 F.3d 80, 87 (2d Cir. 2009) (citing *Messiah v. Duncan*, 435 F.3d 186, 196-98 (2d Cir. 2006)). The Second Circuit has summarized the main points of the AEDPA inquiry as follows:

> Under AEDPA, a federal court may grant a writ of habeas corpus to a state prisoner on a claim that was "adjudicated on the merits" in state court only if it concludes that the adjudication of the claim "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). We must presume the state court's factual findings to be correct and may overturn those findings only if the petitioner offers "clear and convincing evidence" of their incorrectness. 28 U.S.C. § 2254(e)(1).

*Hoi Man Yung v. Walker*, 468 F.3d 169, 176 (2d Cir. 2006) (quoted in *Brisco*, 565 F.3d at 87).

## B.     The "Adequate and Independent State Ground" Doctrine

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that

failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989)(citations and internal quotations omitted). Even where the state court also considers a petitioner's arguments on the merits, that is of no moment because "federal habeas review is foreclosed when a state court has expressly relied on a procedural default as an independent and adequate state ground, even where the state court has also ruled in the alternative on the merits of the federal claim." *Velasquez v. Leonardo*, 898 F.2d 7, 9 (2d Cir. 1990). Thus, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision," the adequate and independent doctrine "curtails reconsideration of the federal issue on federal habeas." *Harris*, 489 U.S. at 264 n. 10; *accord Coleman v. Thompson*, 501 U.S. 722, 735, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991); *Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 809 (2d Cir.2000); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995).

A habeas petitioner can overcome a procedural bar if he can show both "'cause' for noncompliance with the state rule and 'actual prejudice resulting from the alleged constitutional violation.'" *Smith v. Murray*, 477 U.S. 527, 533 (1986) (quoting *Wainwright v. Sykes*, 433 U.S. at 84); *see also Murray v. Carrier*, 477 U.S. 478, 485 (1986); *accord, e.g., Carmona v. United States Bureau of Prisons*, 243 F.3d 629, 633 (2d Cir.2001). The Supreme Court has described "actual prejudice" as occurring when, for example, the petitioner shows "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982). A habeas petitioner establishes "cause" if he can show that "some objective factor external to the defense impeded [his] efforts to comply with

the State's procedural rule." *Murray v. Carrier*, 477 U.S. at 496. An example of cause for default is a "showing that the factual or legal basis for a claim was not reasonably available" at the time preservation was required. *Id.*; *see also Reed v. Ross*, 468 U.S. 1, 15-16 (1984) ("Counsel's failure to raise a claim for which there was no reasonable basis in existing law does not seriously implicate any of the concerns that might otherwise require deference to a State's procedural bar."); *Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994). Ineffective assistance of counsel may constitute cause for a petitioner's failure to pursue a constitutional claim, *e.g.*, *Edwards v. Carpenter*, 120 S.Ct. 1587, 1591 (2000), but in order to constitute cause, counsel's ineffectiveness must itself rise to the level of a constitutional violation, *id.* (stating that "ineffective assistance adequate to establish cause for the procedural default of some *other* constitutional claim is itself an independent constitutional claim" (emphasis in original)).

An alternative manner of overcoming a procedural default is for petitioner to show "failure to consider [the claim] . . . will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. at 750. However, this exception is limited to the "extraordinary" case where a constitutional violation has probably resulted in the conviction of one who is actually innocent. *Schlup v. Delo*, 513 U.S. 298, 327 (1995); *see also Calderon v. Thompson*, 523 U.S. 538, 559, 118 S.Ct. 1489, 140 L.Ed.2d 728 (1998); *Sawyer v. Whitley*, 505 U.S. 333, 338-39 (1992).

## IV.    Analysis of the Petition

### A.    Ground One: Lack of Jurisdiction

Petitioner, under Ground One, asserts violations of New York statutory law, including C.P.L. §§ 170, 180, and 210.20. The gravamen of his claim appears to be that the trial court (i.e.,

Wayne County Court) lacked jurisdiction over him because a complaint had been lodged in the local village court prior to issuance of the indictment. As the C.P.L. § 440.10 court correctly found, arraignment on an indictment supersedes any prior proceedings in the lower court. *See*, *e.g.*, *People v. Hart*, 25 A.D.3d 815, 816, 807 N.Y.S.2d 681, 682 (App. Div. 3d Dept. 2006) (stating that the indictment superseded the criminal court information and the proceedings before the local criminal court, even where there were defects in the accusatory instrument filed in the local court). Therefore, under New York law, the indictment against Thompson superseded all of the prior, village court proceedings.

As respondent correctly points out, New York State law governs the procedure for initiating criminal prosecutions and the effect of arraignment on an indictment; there are no Federal constitutional provisions at play. Because Petitioner's claim is based exclusively upon alleged violations of State statutory law, it is not cognizable on federal habeas review. *E.g. Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Accordingly, this claim asserting merely a defect of state procedural law should be dismissed. *See*, *e.g.*, *Busiello v. McGinnis*, 235 F. Supp. 2d 179, 189 (E.D.N.Y. 2002) (dismissing as not cognizable on federal habeas the claim that Suffolk County Court lacked jurisdiction to try the petitioner and that the criminal proceeding should have been heard by the Family Court).

**B.      Ground Two: Subornation of Perjury from Kevin Hobbs**

**1.      Perjury at Trial**

Thompson asserts that the prosecutor knowingly suborned perjury from the first robbery victim, Hobbs. Thompson bases this claim upon an inconsistency between Hobbs' pre-trial statement and his testimony, for the prosecution, at trial. Specifically, Hobbs refused to identify

Petitioner as one of his assailants when Hobbs met with Investigator Clingerman during their April 12, 2000 meeting. At trial, however, Hobbs identified Petitioner as one of the men who had robbed him at gunpoint.

With respect to Kevin Hobbs, it was no secret that his April 12, 2000 statement to Investigator Clingerman, in which he stated that he had never met petitioner nor spoken with him, was untrue. Defendant Russ' counsel questioned Hobbs extensively about the false statement. T.294-98. The court then instructed the jury that if it found the prior statement to be contradictory, it could consider the inconsistency as it "may reflect upon or discredit the witness' testimony". T.298-99. Petitioner's counsel then asked Hobbs whether he had told Investigator Clingerman that he had never met nor spoken with petitioner, and Hobbs said, "[y]es". T.301. On re-direct examination, the prosecutor established that Hobbs had "lied" to the police on April 12, 2000 because he "didn't want to be involved". T.303. However, Hobbs testified that his second statement was consistent with his trial testimony. T.303. Petitioner cannot establish an entitlement to habeas relief.

A claim that a conviction was based on perjured testimony is analyzed under the Due Process Clause. *Napue v. Illinois*, 360 U.S. 264, 269 (1959). A conviction must be set aside if the prosecutor knew, or should have known, of the perjury and there is any reasonable likelihood that the false testimony affected the verdict. *Duncan v. Fischer*, 410 F. Supp. 2d 101, 116 (E.D.N.Y. 2006) (citations and quotations omitted). To obtain relief on the basis the prosecutor used perjured testimony to secure the conviction, petitioner must show "(1) that the testimony was actually false; (2) that the prosecution knew, or should have known, of the perjury, and (3) that there was a 'reasonable likelihood that the false testimony could have affected the judgment

of the jury.'" *Podlog v. United States*, 2003 U.S. Dist. LEXIS 8904, *19-20 (S.D.N.Y. April 22, 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103 (1976)), *aff'd*, 2005 U.S. App. LEXIS 738 (2d Cir. Jan. 14, 2005). First, petitioner cannot demonstrate that the prosecutor, in presenting Hobbs' trial testimony, was guilty of misconduct. The prosecutor committed no wrong; he simply presented the testimony of a witness who had previously provided police with a false statement, and left the credibility determination to the jury. For the same reasons, petitioner cannot demonstrate that Hobbs' testimony was perjured, let alone that the prosecutor suborned perjury. In the absence of any evidence that Kevin Hobbs testified untruthfully, petitioner cannot show a reasonable likelihood that untruthful testimony could have affected the jury's judgment. Podlog, supra. Although the prosecutor characterized Hobbs as initially having "lied" to the police, the later presentation of Hobbs' contradictory testimony does not amount to the subornation of perjury, given that Hobbs testified that his first statement to police was false, and the jury was instructed that it could consider the prior inconsistent statement in assessing his credibility. Accordingly, Petitioner has failed establish that the prosecutor suborned perjury or committed any other misconduct in connection with Hobbs' testimony.

### 2. Perjury at the Grand Jury Proceeding

Petitioner presents the related claim that the prosecutor "covered up" the alleged procurement by Investigator Clingerman's of a "false identification" by Hobbs. The manner in which the alleged "cover up" occurred is that the prosecutor failed to call Hobbs at at the grand jury. Petitioner's claim cannot serve as a basis for habeas relief. It is well settled that claims of deficiencies in state grand jury proceedings are not cognizable in habeas corpus proceedings. *Lopez v. Reilly*, 865 F.2d 30, 32 (2d Cir. 1989) ("If federal grand jury rights are not cognizable on

direct appeal where rendered harmless by a petit jury, similar claims concerning state grand jury proceedings are *a fortiori* foreclosed in a collateral attack brought in federal court.") (citing *United States v. Mechanik*, 475 U.S. 66, 70 (1986)).  In view of this well-established precedent, Petitioner's claim concerning an alleged Grand Jury error is not cognizable on habeas review.

### C.      Ground Three: Police Misconduct

As his third claim for relief, Thompson asserts that the police officers involved in his case committed "[m]alicious" misconduct, Addendum to Petition at 9 (Docket No. 1). In particular, Thompson accuses Investigator Clingerman (1) of falsifying Hobbs' identification of Thompson when Hobbs was shown a photo array a second time; and (2) of tampering with evidence by planting the "AAA-plus" keychain in the box of property found by the Ronans in their Mercury Mountaineer S.U.V. after it was returned.

When Thompson raised these claims of police misconduct in support of a C.P.L. § 440.10 motion to vacate the judgment, the trial court found that both claims were matters of record in light of the *Wade* hearing and the pre-trial hearing on the admissibility of the physical evidence. Thus, Petitioner could have raised them on direct appeal. *See* Respondent's Exhibit O, pp. 3-4. Accordingly, the trial court dismissed them as procedurally barred under C.P.L. § 440.10(2)(c).[2] Respondent argues that the trial court's reliance upon C.P.L. § 440.10(2)(c), which has been deemed an independent and adequate state ground, creates a procedural default sufficient to bar federal habeas review. The Court agrees.

---

[2]      C.P.L. § 440.10(2)(c) states that a court "must" deny a motion to vacate a judgment when "[a]lthough sufficient facts appear on the record of the proceedings underlying the judgment to have permitted, upon appeal from such judgment, adequate review of the ground or issue raised upon the motion, no such appellate review occurred owing to the defendant's unjustifiable failure to take or perfect an appeal during the prescribed period or to his unjustifiable failure to raise such ground or issue upon an appeal actually perfected by him." N.Y. Crim. Proc. Law 440.10(2)(c).

A "firmly established and regularly followed state practice" interposed by a State has the effect of preventing subsequent review by this Court of a federal constitutional claim, *James v.Kentucky*, 466 U.S. 341, 348-49 (1984), and the New York procedural rule of C.P.L. § 440.10(2)(c) has been recognized as such a firmly established and regularly followed rule. *E.g.*, *Aparacio v. Artuz*, 269 F.3d 78, 93 (2d Cir. 2001). In other words, C.P.L. § 440.10(2)(c) was not only an independent basis for the state court's judgment, it also constitutes an adequate ground for denial of Thompson's record-based police misconduct claim. The Court thus recommends finding that the adequate and independent state ground is appropriately invoked here to procedurally default the police misconduct claim. Thompson has not demonstrated cause or prejudice. Furthermore, he has not come forward with any new, reliable evidence to demonstrate that he is factually innocent of the charges against him and thus cannot benefit from the fundamental miscarriage of justice exception. Accordingly, the Court recommends dismissing Ground Three as subject to an unexcused procedural default.

### D.    Ground Four: Failure of the Prosecutor to Fulfill Due Process Disclosure Obligations

Next, Thompson contends that the prosecutor violated the disclosure obligations articulated by *Brady v. Maryland*, 373 U.S. 83 (1963), in two ways. First, the prosecutor failed to disclose an unredacted bill for Torey Ronan's cell phone, which she had left in the Mercury Mountaineer S.U.V. (Exhibit R, Grounds, p. 20). According to Petitioner, the prosecutor did not disclose any portion of the bill for March 26, 2000, and the times of the calls placed on March 27, 2000, were not disclosed. Petitioner appears to contend that the bill would have reflected that Johnson was in the Mountaineer at the time of the crime, because he called friends, family, and

associates. (Exhibit H, p. 5). Second, Petitioner complains that the prosecutor failed to disclose "evidence" of Investigator Clingerman's alleged tampering with the photo arrays and Hobbs' "misidentification" of the defendants–which resulted, according to Petitioner, from Investigator Clingerman's alleged misconduct in regards to the preparation of the photo arrays. (Exhibit R, Grounds, pp. 17-18).

Respondent concedes that Both Brady claims are exhausted, but notes that they are subject to different standards of review as a result of the state courts differing adjudications of them. Petitioner raised the cell phone records claim in his first C.P.L. § 440.10 motion, but he asserted the photo-array tampering claim in his second C.P.L. § 440.10 motion. The court rejected Petitioner's cell phone records claim, holding that Petitioner had "failed to demonstrate that such information was specifically requested, that the documents constitute potentially exculpatory material or that such information could have affected the outcome of the trial." (Exhibit O, ¶ 2). The court's second C.P.L. § 440.10 decision did not address the photo-array argument at all, so, Respondent argues, that claim is subject to *de novo* review. Because both claims fail under a de novo standard, the court will review them without the lens of AEDPA deference.

"The suppression by the prosecutor of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." Brady v. Maryland, 373 U.S. at 87. A true *Brady* violation has three components: (1) the evidence is favorable to the defendant in that is exculpatory or has impeachment value; (2) the evidence was suppressed by the State, either intentionally or inadvertently; and (3) prejudice ensued. *Boyette v. LeFevre*, 246 F.3d 76, 88 (2d

Cir. 2001) (citations omitted). The failure to make a showing of any one of these components is fatal to a petitioner's Brady claim.

As to the "suppression" element, the petitioner bears the burden of proffering a "nonspeculative basis for inferring that . . . the government had not made available to him all pertinent material in its possession." *United States v. Avellino*, 136 F.3d 249, 261 (2d Cir. 1998). "Favorable to the accused" refers to "material evidence" that "either . . . is exculpatory or . . . can serve to impeach a key witness." *Shabazz v. Artuz*, 336 F.3d 154, 161-62 (2d Cir. 2003). The "prejudice" component requires a demonstration of "materiality." *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 105 S. Ct. 3375 (1985)) That is, the petitioner must show "'a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Boyette*, 246 F.3d at 91 (quoting *United States v. Bagley*, 473 U.S. at 682).

Thompson's two *Brady* claims both fail the materiality test. With regard to the allegedly suppressed cell phone records, he has not shown that the redacted portions of the records were exculpatory or that the reduction of the records prejudiced the defense. As respondent points out, petitioner has never produced the actual redacted cell phone bill but rather has submitted a handwritten list of telephone numbers which he claims belong to Johnson's friends and family members. Petitioner contends that if he had known the times that these calls were made, he could have placed Johnson in the Mercury Mountaineer SUV at the time of the crime. Because Johnson testified that he was in the SUV earlier that evening, Thompson's claim that the listing of the call times would have assisted his defense is speculative for several reasons.

First, even assuming for the sake of argument that Johnson was in the S.U.V. at the time

that Henrichon's home was invaded, the evidence would not have exonerated petitioner. Nor would it necessarily have undermined Johnson's testimony. This is because the evidence would not have prevented the jury from concluding that petitioner, Madison, and Russ forcibly entered Henrichon's house, attacked her, and stole some of her belongings. I agree with respondent that there is no record evidence to support the intimation that Johnson was somehow involved in home invasion especially given Velasquez's testimony that Johnson earlier had warned him of a possible robbery. T. 402, 416-17.

Second, having the cell phone records with the exact times of certain calls would not have been of much use because the witnesses were unable to pinpoint the relevant time-periods. T.330, 347, 423, 432, 455. The court does not see how petitioner would have been able to demonstrate that Johnson was using the cell phone at the time of the crime. More important, a cell phone is not stationary–it is mobile. Therefore the caller's physical location at the time a call is placed cannot be traced simply through cell phone records.

Third, the redacted portions of the cell phone bill could not possibly have affected the verdict. The home invasion victim, Henrichon, had known Johnson prior to the incident, and definitively ruled him out as one of the assailants. For all these reasons, I recommend finding that the trial court correctly concluded that the cell phone records were not material and thus Thompson did not state a viable Brady claim.

I turn next to petitioner's allegations that the prosecutor "suppressed" investigator Clingerman's allegedly tainted photographic array, which allegedly resulted in a falsified identification by Hobbs of petitioner. There was no "suppression" as evidenced by the record. First, all of the photographic arrays which allegedly were tampered with by investigator

Clingerman were introduced into evidence at the *Wade* hearing. Second, both sides knew that Hobbs at first did not implicate petitioner in the crime, fearing reprisals from Petitioner and his cohorts. In a later interview with Investigator Clingerman, he identified Petitioner as one of the perpetrators. Defense counsel emphasized Hobbs's initial mendacities on cross examination, and the prosecutor mentioned it on redirect examination. For all these reasons, I recommend finding that the prosecutor did not "suppress" Investigator Clingerman's purported meddling with the photo arrays so as to lead to the false identification of Petitioner by Hobbs. Accordingly, I recommend concluding that Petitioner has failed to state a colorable *Brady* claim. In sum, I recommend dismissing Ground Four the petition.

### E. Ground Five: Denial of the Right to Compulsory Process and the Right to Prepare a Defense

Petitioner claims that the trial court refused to allow his counsel to subpoena (1) several doctors (Drs. Siratenko and Wolfe and the Wayne County Jail physician, hereinafter "the treating physicians") who allegedly would have testified as to Petitioner's alleged physical disabilities; (2) one Emanuel Harald Madison, Petitioner's so-called "home attendant" ("the home attendant"); and (3) one Bryant Adams ("the uncalled alibi witness"), who would have testified, according to Petitioner, that Petitioner was not in the Mercury Mountaineer S.U.V. at the pertinent time.

Petitioner also claims that the trial court unjustifiably moved the trial date to an earlier date (that is, to February 13, 2001, from February 26, 2001), which hindered petitioner's ability to prepare his defense.

The C.P.L. § 440.10 court found these claims to be procedurally barred pursuant to C.P.L.

§ 440.10(2)(c), as they were record-based claims that could have been raised on direct appeal. The C.P.L. § 440.10 court held, in the alternative, that they were without merit, finding that Petitioner was "vague and speculative as to the nature of the testimony to be offered by the alleged witnesses", and that the claim was factually baseless since the trial court "in no way prohibited [Petitioner] from calling witnesses."[3] Respondent has asserted the affirmative defense of procedural default with regard to these claims, on the basis that the trial court relied upon an adequate and independent state ground to dismiss them. I agree with respondent for the reasons stated above in this Report and Recommendation. Also as stated above, I find that Thompson has failed to demonstrate cause and prejudice, or that a fundamental miscarriage of justice would occur should the habeas court fail to hear the claim. Accordingly, I recommend that the claims asserted under Ground Five be dismissed on the basis that they are procedurally defaulted.

### F.    Ground Six: Prosecutorial Misconduct and Subornation of Perjury

To the extent that the allegations under Ground Six state a comprehensible claim, it appears that Petitioner is arguing the prosecutor created a false "inference" of guilt by introducing Henrichon's testimony regarding certain stolen property–namely, that the "No. 1 Dad" and "AAA plus" keychains and a necklace were taken from her apartment. Petitioner contends that this testimony was false and that the prosecutor knew it was false because, according to Petitioner, Henrichon belatedly informed the police that these items had been stolen (i.e., two months after the crime, when she met with Investigator Clingerman to examine the box

---

[3]        The trial court did not hinder petitioner's counsel in his efforts to construct a defense. The court granted petitioner's counsel's request for investigative and medical expert services on January 17, 2001. (See Exhibits S and T to Exhibit R, Petition). Counsel also secured the court's permission to file a late alibi notice, and he filed a "Notice of Witnesses" listing the names Jacqueline Rowe and Bryant Adams (Exhibit V to Exhibit R, Petition; Minutes of November 22, 2000 Proceedings, p. 8). In view of this record, I agree with respondent that petitioner was given ample opportunity to locate witnesses and prepare a defense.

of property provided by the Ronans, which the Ronans found in the Mercury Mountaineer and turned over to the police in downstate New York).

Petitioner appears to suggest that Henrichon's testimony that she owned the "AAA plus" keychain, see T.359-60, contradicted Velasquez's testimony that Petitioner and his cohorts stole a set of keys from him, *see* T.405.[4] From this, Petitioner deduces that Henrichon perjured herself.

Respondent points out that Petitioner's allegations may also be read to suggest that the prosecutor suborned Henichon's perjury inasmuch as Henrichon testified that the "No. 1 Dad" keychain belonged to her roommate, T.383, while Torey Ronan testified that Petitioner had given *her* the "No. 1 Dad" keychain, T619.

Thompson apparently is arguing that by allowing the witnesses to testify as summarized above regarding the "AAA plus" keychain, the prosecutor created a "false inference of guilt" on the part of Petitioner and his co-perpetrators with regard to the stealing of of "AAA plus" keys from Henrichon's apartment. The C.P.L. § 440.10 court found that Petitioner's allegations that the prosecutor had knowingly introduced false testimony were "conclusory and unsupported by facts". The state court further found that the testimony of Henrichon "regarding the keys was subject to cross-examination and presented an issue of credibility for the jury." Thus, the state court essentially concluded that Petitioner had failed to demonstrate that any perjured testimony was introduced by the prosecutor. I agree with the state court, as discussed further below.

As Respondent explains, because the C.P.L. § 440.10 court adjudicated this claim on the merits, Petitioner can only obtain habeas corpus relief by showing that the court's decision was

---

[4]       It does not appear that Velasquez looked through the box of property to identify which items were his; however, the box did contain a necklace with a scorpion charm; as noted above, Velasquez testified that a scorpion necklace had been taken from him that night.

-26-

"contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court criminal proceeding. *See* 28 U.S.C. § 2254(d)(1), (2).

Petitioner's claim that his conviction was based on perjured testimony is analyzed under the Due Process Clause of the Fourteenth Amendment. *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959). The Supreme Court held in *Napue* that a conviction must be set aside if "(1) 'the prosecution knew, or should have known, of the perjury,' and (2) 'there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *Drake v. Portuondo*, 321 F.3d 338, 345 (2d Cir. 2003) (quoting *United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) (footnote in *Drake* omitted)).

"[I]n order to proceed to the test for whether or not a conviction violated the Due Process Clause because of the introduction of perjured testimony, it must first be shown that a government witness did, in fact, commit perjury." *Washington v. Cuomo*, "'A witness commits perjury if he gives false testimony concerning a material matter with the willful intent to provide false testimony, as distinguished from incorrect testimony resulting from confusion, mistake, or faulty memory.'" *Id.* (quoting *United States v. Monteleone*, 257 F.3d 210, 219 (2d Cir. 2001) (citing *United States v. Dunnigan*, 507 U.S. 87, 94, 113 S.Ct. 1111, 122 L.Ed.2d 445 (1993)).

"Perjury is established by showing that the witness 'knowingly and willingly' gave 'materially false' testimony." *Ellis*, 2001 WL 726983, at *4 (quoting 18 U.S .C. § 1001(a)(2) and citing *United States v. Salameh*, 54 F. Supp.2d 236, 261-62 (S.D.N.Y. 1999)). Merely pointing to inconsistencies in a witness's testimony to support an allegation of perjury is insufficient.

*E.g.*,*United States v. Bortnovsky*, 879 F.2d 30, 33 (2d Cir.1989) (explaining that the presentation of a witness who recants or contradicts prior testimony should not be confused with perjury); *United States v. Gambino*, 59 F.3d 353, 365(2d Cir.1995) (holding that even a direct conflict in a witness's testimony does not in itself constitute perjury). "Simple inaccuracies or inconsistencies in testimony do not rise to the level of perjury." *Monteleone*, 257 F.3d at 219.

As noted above, in deciding Petitioner's C.P.L. § 440.10 motion, the state court found that he failed to prove that Henrichon's testimony was false–in other words, that Petition failed to establish that perjury occurred. This factual determination is afforded a presumption of correctness under 28 U.S.C. § 2254(e)(1). *See*, *e.g.*, *Ellis v. McGinnis*, No. 00-CV-3246(FB), 2001 WL 726983, at *5 (E.D.N.Y. June 28, 2001) ("In deciding Ellis's § 440.10 motion, the state court found that Ellis failed to prove that Rivera's testimony at Ellis's second trial was false. Affording this determination its due deference, the Court finds that the petitioner has not rebutted its presumption of correctness by clear and convincing evidence. The testimony provided by Rivera at Lee's re-trial does not prove that Rivera "knowingly and willingly" testified falsely at Ellis's second trial.").

Here, all Thompson has done is to point out inconsistencies in Henrichon's testimony, and that is clearly insufficient to establish perjury. Giving the C.P.L. § 440.10 court's factual determination the deference due under the statute, the Court finds that Petitioner has not rebutted its presumption of correctness by clear and convincing evidence. Furthermore, the state court's conclusion fully comported with Federal law. I agree with Respondent that the testimony regarding who owned the keychain presented, at most, a very minor factual issue for the jury to resolve. And, as the C.P.L. § 440.10 court noted, Henrichon was cross-examined as to when she

realized that two sets of keys had been stolen. T.379-82. *See United States v. Sanchez*, 969 F.2d 1409, 1415 (2d Cir.1992) ( "Differences in recollection alone do not add up to perjury. Under the circumstances of this case, the differences in testimony presented a credibility question for the jury, at most.") (internal citations omitted)).

Once perjury is established, if the government "knew or should have known about the perjury, the conviction must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *United States v. Gallego*, 191 F.3d 156, 161-62 (2d Cir.1999) (internal quotation omitted). As Respondent points out, the box of property retrieved from the Mercury Mountaineer contained items that were highly incriminating. These items included, in addition to a red bandanna and documents bearing Petitioner's name, Henrichon's necklace, Petitioner's red sweatshirt with "New York" on it, and a tape dispenser with co-defendant Madison's fingerprint on it. However, Petitioner has not challenged Henrichon's testimony regarding these items, which were significantly more important in corroborating the victims' testimony. The prosecutor's presentation of allegedly conflicting evidence over the ownership of a set of keys might have presented, at most, a minor conflict for the jury to resolve. There is no reasonable likelihood that the conflict would have affected the jury's verdict, and thus Thompson has not demonstrated that the alleged inconsistencies were material to his conviction.

In this Court's opinion, this claim is patently without merit, and Ground Six accordingly should be dismissed.

### G. Ground Seven: Ineffective Assistance of Trial Counsel

#### 1. Overview and Applicable Legal Principles

Respondent has aptly summarized the grounds upon which Petitioner contends that his trial counsel was ineffective: (1) counsel failed to call alleged alibi witnesses Emanuel Madison, Rasheem Harris and Bryant Adams, and failed to present medical testimony to attest to petitioner's alleged disability; (2) counsel failed to object when Robert Johnson invoked his Fifth Amendment privilege; (3) counsel failed to utilize the evidence that Kevin Hobbs "misidentified" Petitioner and his cohorts; (4) counsel failed to use allegedly exculpatory evidence, namely, Rebecca Henrichon's initial statement to the police; (5) counsel failed to challenge two jurors for cause; (6) counsel failed to resolve an alleged conflict of interest or move to recuse the trial judge; and (7) counsel failed to have additional police officers removed from the courtroom.

Respondent concedes that all but one of Petitioner's ineffective assistance claims were exhausted–namely, that trial counsel should have had additional law enforcement officers removed from the courtroom. Although Petitioner claimed in his *pro se* supplemental brief that the trial judge erred in not removing the extra officers, the claim was not argued in terms of counsel being ineffective. The Appellate Division held that the claim of error on the part of the trial judge was meritless. *People v. Thompson*, 300 A.D.2d at 1032, 751 N.Y.S.2d at 921. As Respondent argues, the ineffective assistance claim has never gone through one complete round of appellate review in the New York State courts as is required by the exhaustion doctrine. *See Picard v. Connor*, 404 U.S. 270, 278 (1971). Respondent argues that the claim should be "deemed exhausted" because Petitioner has no open avenues for review in the State courts, but nonetheless procedurally defaulted because of the State procedural rules that preclude the State courts from hearing the claim. *See Grey v. Hoke*, 933 F.2d 117, 120-21 (2d Cir. 1991); *accord Ramirez v. Attorney General*, 280 F.3d 87, 94 (2d Cir. 2001).

Rather than engaging in any further discussion of the exhaustion and procedural default question, the Court recommends that the claim be denied pursuant to 28 U.S.C. § 2254(b)(2), which authorizes the district courts to deny, on the merits, a petition containing unexhausted claims. Although neither the Supreme Court nor the Second Circuit has definitively stated the standard under which to review these claims, this Court believes that even under a pre-AEDPA standard of review, this particular claim of ineffective assistance–and Thompson's other allegations of ineffective assistance–clearly lack merit and can be dismissed. Indeed, as the C.P.L. § 440.10 court found, "considered individually or as a totality, the actions taken by the trial attorney did not deprive [petitioner] of meaningful representation." C.P.L. § 440.10 Order, ¶ 7(g) (Resp't Ex. O).

The familiar standard for evaluating claims of ineffective assistance of counsel is found in *Strickland v. Washington*, 466 U.S. 668 (1984). There, the Supreme Court held that in order to prevail, a petitioner must show that his counsel supplied deficient representation and that the petitioner suffered prejudice as a result of that deficient performance. *Id.* at 687. Counsel's conduct must have "so undermined the proper functioning of the adversarial process" that the process "cannot be relied on as having produced a just result," in order to be deemed constitutionally deficient. Counsel is "strongly presumed" to have rendered adequate assistance and to have made all significant decisions in the exercise of reasonable professional judgment. *Id.* at 686, 689-90.  The second, or prejudice, prong, requires that the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional" or erroneous advice, the result of the trial would have been different. *Id.* at 694. If a petitioner makes an insufficient showing on one prong, there is no need for the reviewing court to consider the second prong. *Id.*

at 697. The Court now turns to consideration of each of the alleged deficiencies in trial counsel's performance.

## 2. Alleged Errors by Trial Counsel

### a. Failure to Call "Alibi" or "Exculpating" Witnesses

Petitioner claims that his counsel should have presented the testimony of Emanuel Madison, petitioner's "manservant"; Rasheem Harris; and Bryant Adams.

According to Petitioner, Emanuel Madison who would have testified that Petitioner "had no use of his hands." Petitioner reasons that if he had no use of his hands, then he could not have participated in the home invasion and robberies on the night in question.

Rasheem Harris purportedly would have related that, on the night in question, Petitioner and Rowe (the mother of Petitioner's child) stopped by Harris' house and therefore could not have been present at any of the crimes.

Lastly, Bryant Adams allegedly would have testified that he saw Hobbs and Johnson at about midnight in an sport-utility-type truck.

When this claim concerning uncalled witnesses was raised in the C.P.L. § 440.10 motion, the trial court ruled that counsel had not been ineffective in failing to presenting this additional testimony, noting that "no request was made at trial by [Petitioner] to call additional alibi witnesses." C.P.L. § 440.10 Order, ¶ 7(a) (Resp't Ex.O). Similarly, as a matter of federal law, the decision whether to call witnesses constitutes a strategy matter that is generally beyond question. *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir.) ("The decision whether to call any witnesses on behalf of the defendant and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial."), *cert. denied*, 484 U.S. 958 (1987);

*United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir. 1974) ( "[T]he decision

to call or bypass particular witnesses is peculiarly a question of strategy, *United States v.*

*Matalon*, 445 F.2d 1215, 1219 (2d Cir.), cert. den., 404 U.S. 853 (1971), which courts will

practically never second-guess."); *see also United States v. Eyman*, 313 F.3d 741, 743 (2d Cir.

2002) (*per curiam*), *cert. denied*, 538 U.S. 1021 (2003).

　　　Petitioner has demonstrated neither that trial counsel's unreasonably exercised his

professional judgment in not calling Emanuel Madison, Harris, or Adams, nor that their

testimony would have resulted in a more favorable verdict. First, Petitioner's "manservant,"

Emanuel Madison, was not an alibi witness since he would not have testified to Petitioner's

whereabouts on the night of the incident. *See Matthews v. Mazzuca*, 2003 U.S. Dist. LEXIS

16713, *13 (S.D.N.Y. Sept. 22, 2003) (counsel's performance did not prejudice petitioner where

the proposed alibi witness could not testify as to petitioner's location at the time of the crime), ,

aff'd, 2005 U.S. App. LEXIS 1436 (2d Cir. Jan. 28, 2005). Furthermore, Emanuel Madison's

proposed testimony that Petitioner was unable to fully use his hands was not exculpatory

because, in order to prove Petitioner's culpability, the prosecutor only had to demonstrate that

Petitioner shared with his cohorts an intent to commit the crimes charged.

　　　Second, the testimony of Rasheem Harris would not have advanced the defense.

According to Petitioner, Harris would have confirmed that he and Harris spoke at about midnight

"in pursuit of locating a [sic] SUV truck, which would have strengthen[ed] petitioner['s] alibi

defense." That testimony would have conflicted with Rowe's trial testimony for the defense that

she and Petitioner were at Rowe's mother's house between 11:15 p.m. and 1:10 a.m. *See* T.639-

44. Harris' testimony would have created an additional conflict with Rowe's testimony inasmuch

as Rowe testified that before she dropped Petitioner off in Newark, she and Petitioner drove

through Geneva looking for Emanuel Madison, not Harris. T.641-42.

Another potential problem for the defense would have been created by Harris' proposed

testimony. Specifically, Harris stated that Petitioner was desirous of obtaining a truck, would

have corroborated Torey Ronan's testimony that Petitioner borrowed her mother's Mercury

Mountaineer. In his affidavit (*see* Petition, Ex. U), Harris states that in addition to seeing

Petitioner, he also saw "Tony" (i.e., co-defendant Rasheen Madison, who used the alias of "Tony

Jones") and co-defendant Bryon Russ that night.

In any event, in his affidavit, Harris admitted that he never spoke with a defense

attorney's investigator regarding the events of March 26, 2000, to March 27, 2000, because he

(Harris) was incarcerated at the time Petitioner was facing trial and Harris' girlfriend had moved

out of town. Given these circumstances, trial counsel cannot be faulted for not presenting Harris'

testimony, which, even if it was of marginal helpfulness, still posed a significant potential

downside.  Moreover, through no fault of his own, trial counsel was not aware of Harris'

testimony when preparing Thompson's defense.

Finally, the Court turns to Adams, whom Petitioner's counsel had included on the

"Notice of Witnesses" he submitted at trial. However, trial counsel subsequently declined to call

Bryant for the defense. That this was a reasonable strategic decision is reinforced by Petitioner's

admission in his petition, that " Adams informed counsel that on the date of the charged crime he

saw the [People's] two material witness[es], Kevin Hobbs and Robert Johnson around 12:00

a.m., they were in the SUV truck, which petitioner was searching for at the same time." Petition,

Grounds for Relief, p. 29 (Docket No. 1). As Respondent explains, this testimony not only would

have conflicted with proposed witness Harris' testimony (discussed in the preceding paragraph), but it would have corroborated Hobbs' and Johnson's testimony that they were in an SUV in which Petitioner had some kind of interest (as Torey Ronan later testified, Petitioner had "borrowed" the vehicle from her).

I agree that to the extent counsel was aware of the three witnesses, given the contradictions inherent in their testimony, and the general unhelpfulness of it to the defense, counsel reasonably declined to call them to testify. Furthermore, the uncalled witnesses' stories, taken singly or together, would not have resulted in a more favorable verdict for Thompson.

### b.    Failure to Present Medical Testimony

The C.P.L. § 440.10 court rejected Petitioner's claim that trial counsel was ineffective in failing to present medical expert witnesses to testify as to Petitioner's alleged disability (i.e., the lack of the ability to use his hands). That court found that medical testimony that Petitioner "allegedly has limited use of his hands does not support a claim that he could not participate in the crimes charged, with the requisite intent." C.P.L. § 440.10 Order, ¶ 7(b) (Resp't Ex. O). In this Court's opinion, the C.P.L. § 440.10 court correctly determined that this claim was meritless.

When reviewing trial counsel's performance, a habeas corpus court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689, while resisting the temptation to rely upon hindsight to second-guess counsel's unsuccessful trial strategy, *id.* The Second Circuit has held that "the decision to call or bypass particular witnesses is peculiarly a question of trial strategy, *United States v. Matalon*, 445 F.2d 1215, 1219 (2d Cir.), *cert. denied*, 404 U.S. 853, 92 S.Ct. 92, 30 L.Ed.2d 93 (1971), which courts will practically never second-guess."

*United States ex rel. Walker v. Henderson*, 492 F.2d 1311, 1314 (2d Cir.1974). *See also Strickland*, 466 U.S. at 689-90 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable[.]").

"'Where an expert would only marginally assist the jury in its role as fact finder, an attorney's decision not to call an expert is more likely to fall within the bounds of reasonable performance and less likely to prejudice the defendant.'" *Massaro v. United States*, No. 97 Civ.2971 MGC, 2004 WL 2251679, at *4 (S.D.N.Y. Oct.5, 2004) (quoting *United States v. Aliotta*, No. 97 Cr. 311, 1998 WL 43015, at *3 (S.D.N.Y. Feb. 3, 1998)); *see also Williams v. Herbert*, 435 F. Supp. 2d 199, 206 (W.D.N.Y. 2006) (Bianchini, M.J.) (rejecting claim that counsel should have presented the testimony of an expert regarding the effects of cocaine in the victim's system to corroborate the petitioner's theory that the deceased was the initial aggressor where the possible effects of cocaine on the victim's behavior would have been of dubious relevance since Petitioner had never alleged that the victim had been exhibiting aberrant, potentially drug-induced conduct and the conduct Petitioner attributed to him (stealing Petitioner's necklace and running away) was not "aberrant behavior sufficient to cause fear and to warrant a forceful response").

In the present case, trial counsel reasonably investigated the option of going forward with a medical defense and sought funding to retain an expert witness to evaluate Petitioner's alleged medical condition. Where, as here, trial counsel made a reasonable investigation of the defense, and given that trial counsel obviously could have observed Petitioner's claimed disability, Petitioner has not provided the Court with reason to believe that trial counsel's ultimate decision not to call a medical expert to testify was not made in the exercise of a reasonable strategy. *See*

*Gonzalez v. Bennett*, 2001 U.S. Dist. LEXIS 19798, *24-25 (S.D.N.Y. Nov. 29, 2001). *Cf.*

*Benjamin v. Greiner*, 296 F. Supp. 2d 321, 330 (E.D.N.Y. 2003) (where counsel *fails* to make a

reasonable investigation that is necessary to the defense, the decision is not based on strategy and

is subject to review under *Strickland*'s prejudice prong). As Respondent argues, a medical

defense arguing that Thompson was totally unable to personally participate in the crimes would

not have been plausible, in the face of testimony that Petitioner was entirely capable of driving a

sport-utility vehicle. Torey Ronan testified that Petitioner borrowed her mother's Mercury

Mountaineer, T.606-07; and Kevin Hobbs testified that Petitioner was the one who drove the

Mountaineer to Newark, on the night they were hanging out together, T.279-80. At the least,

Petitioner's shared intent would be sufficient to sustain his conviction, as the C.P.L. § 440.10

court correctly noted.

### 3. Failure to Object to Witness' Assertion of Fifth Amendment Privilege Against Self-Incrimination and Failure to Adequately Cross-Examine that Witness

Thompson faults trial counsel for failing to object when Johnson invoked his Fifth

Amendment rights and for failing to interrogate Johnson about a convenience-store robbery–for

which Johnson was not charged–that occurred two hours before the events for which Thompson

was indicted. In denying this claim, the C.P.L. § 440.10 court found that trial counsel had not

been ineffective in this regard since Johnson "was impeached at the time of trial, and further

impeachment would have been cumulative." C.P.L. § 440.10 Order, ¶7(c) (Resp't Ex. O).

Turning first to the failure-to-object aspect of this claim, Thompson cannot demonstrate

that he was prejudiced by the failure to object, since the attorney for co-defendant Russ registered

that objection, which was denied. Furthermore, because Russ' counsel questioned  Johnson about

crimes unrelated to the crimes at bar, his invocation of his right against self incrimination was proper. In People v. English, 277 A.D.2d 1021, 1022, 716 N.Y.S.2d 225, 225-26 (4th Dept. 2000), the court found that a prosecution witness had properly invoked the right against self incrimination where, as here, the matter on which the witness was questioned related only to the witness's credibility and not to the facts of the defendant's crime.  *See also People v. Owusu*, 234 A.D.2d 893, 893, 659 N.Y.S.2d 914, 915 (4th Dept. 1996) (claim that court failed to strike the testimony of a witness after he invoked Fifth Amendment protection failed; invocation of that right concerned crimes that did not pertain to the facts surrounding the crimes for which the defendant was charged); *People v. Kaufman*, 156 A.D.2d 718, 718, 549 N.Y.S.2d 471, 472 (2d Dept. 1989) (invocation of Fifth Amendment rights concerned crimes that the witnesses may have committed but for which they had not been convicted; invocation was thus proper).

Johnson did admit on cross-examination that he had pleaded guilty to fifth degree conspiracy in 2000. He declined, however, to comment on the facts underlying the guilty plea. T.331. When counsel for co-defendant Russ objected to Johnson's invocation of his Fifth Amendment privilege, Johnson's counsel explained that since his client had not yet been sentenced for the crime, he was advising him not to comment on the underlying facts. T. 332. Co-defendant Russ' counsel then asked whether Johnson had ever robbed anyone in Chemung County, assaulted anyone in Tompkins County, or been involved in a gang-related assault in Tompkins County. T.332.   Johnson invoked his Fifth Amendment privilege and refused to answer these questions.

Consequently, the trial court instructed the jury as follows:

I instruct you that no inference favorable or unfavorable to either party may be

drawn by you from [Johnson's] refusal to answer the particular questions. However, since the questions relate solely to his own credibility as a witness, you may take into consideration the refusal to answer such questions in determining, as you may with all witnesses, to what extent you believe his testimony and how much weight you wish to give to his testimony in view of his refusal to answer certain questions.

T.333. The court correctly instructed the jury during the preliminary instructions that a proper question and answer together constitute evidence, T.255, and thus the content of Russ' counsel's questions to Johnson were properly considered by the jury in assessing witness credibility.

In light of these proper jury instructions, I cannot say that the C.P.L. § 440.10 court was incorrect in finding that any additional impeachment of Johnson based upon additional cross-examination regarding the underlying facts of the uncharged robbery would have been cumulative.

Turning next to counsel's alleged failure to adequately cross-examine Johnson, I note as an initial matter that the decisions as to whether to cross-examine a victim and if so, to what extent, are tactical matters as to which trial counsel's judgment is given deference. *E.g.*, *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987). As Respondent points out, it was quite reasonable for trial counsel to avoid delving into Johnson's participation in the convenience store robbery committed two hours before the crimes with which Thompson was charged, since there was evidence that the gun used in the convenience store robbery was similar in appearance to the gun used in the Henrichon home invasion. According to Petitioner and to the documents he has provided in support of his habeas petition, *see* Pet'r Ex. X, Johnson used a "silver/chrome"-colored gun. This description is consistent with the description of the gun used in the crimes for which Thompson was on trial. In addition, a Ford Explorer, also a sport-utility vehicle, was

described as being the "getaway" vehicle for Johnson's convenience store robbery. Had this information been presented to it, the jury likely would have drawn a connection between Thompson and the convenience store robbery: as noted above, Petitioner was said to have used a a small, silver-colored gun and was driving a Mercury Mountaineer sport-utility vehicle, which is manufactured by the Ford Motor Company. Thus, the jury reasonably could have inferred that Thompson had been involved in the convenience store robbery as well as the Henrichon home invasion and the robberies of Hobbs and Velasquez. I agree with Respondent that trial counsel had a reasonable basis for refraining from a line of questioning which likely would have led to the jury concluding that, over the weekend of March 26-27, 2000, Petitioner had gone on "a robbery spree".

### 4.      Failure to Impeach Hobbs' Identification Testimony

Next, Petitioner asserts that trial counsel failed to properly utilize what Petitioner calls the "misidentifications" of him by Hobbs during Hobbs' initial police interview on April 12, 2000. As explained above in this Report and Recommendation, Hobbs at first did not identify Petitioner as one of the men who had robbed him. Hobbs later identified Petitioner, and stated that his earlier statement to the police had been false. Petitioner persists in deeming Hobbs' statements a "misidentification" but this is not accurate. As Petitioner's appellate counsel explained in a letter to petitioner dated June 9, 2002, there was no "misidentification" and "there [was] a lack of evidence to support [Petitioner's] contention in the record." Exhibit G to the Petition (Docket No. 1).

In any event, the claim is not supported by the record, as Respondent argues and appellate counsel attempted to explain to Petitioner. All three defense counsel thoroughly cross-examined

Hobbs regarding his initial statement to the police, which he later claimed had been false. *See* T.294-98, 301, 303. There is no question that the jury was aware that Hobbs had lied to the police on April 12, 2000, and that his earlier untruthfulness could be considered in assessing his credibility. As the C.P.L. § 440.10 court concluded, "the record indicates that the attorney made appropriate use of such evidence during cross-examination; the extent of cross-examination is a matter of tactics." C.P.L. § 440.10, ¶ 7(g) (Resp't Ex. O).

### 5. Failure to Adequately Cross-Examine the Home Invasion Victim, Henrichon Regarding Prior Inconsistent Statements to Police

Petitioner faults trial counsel for not cross-examining Henrichon with her prior statements to the police investigators that Velasquez appeared to be "joking" during the robbery which appeared to have been "staged". Trial counsel did present this theory on summation, after he obtained certain admissions from Henrichon and Velasquez on cross-examination; rather than by confronting Henrichon with her statements and risking that she might explain her prior statements away. As the C.P.L. § 440.10 court correctly observed, because the extent of cross-examination is a matter of tactics, trial counsel cannot be found ineffective for electing to present this theory in the manner urged by Petitioner. C.P.L. § 440.10 Order,¶7(g) (Resp't Ex. O). The law is well settled that decisions whether to engage in cross-examination, and to what extent, are strategic in nature, and generally not a proper basis for finding that trial counsel acted in a professionally unreasonable manner. *United States v. Nersesian*, 824 F.2d 1294, 1321 (2d Cir. 1987).

Petitioner's counsel's defense theory was that: (1) petitioner was never in the Henrichon home; (2) Nelson Velasquez was involved in a staged crime; and (3) Rebecca Henrichon was an

innocent, but frequently mistaken, victim. Here, counsel obtained the points he needed from cross-examination of Henrichon and Velasquez, and then constructed his summation argument.

First, he established on cross-examination of Henrichon and Velasquez that the two were good friends (T: 382, 417). He elicited Velasquez's knowledge that Henrichon's two young children were sleeping in the house (T: 417). Counsel also had Velasquez admit that he told no one about the upcoming robbery, he moved marijuana from the Henrichon house to Brian Tyler's house, and, during the robbery, he saw no one's face and he was not taped or tied up (T: 417-20). With this evidence, counsel argued on summation that even though Nelson Velasquez and Rebecca Henrichon were good friends, he did not tell her about the robbery (T: 682). Velasquez and Foss were waiting outside while the attackers were in the home; Velasquez had a ride waiting for him because he was "going to get out of there" (T: 683). Also, counsel pointed out that Velasquez was not tied up during the robbery, but Henrichon was tied and taped (T: 683). Counsel then argued that although Henrichon was a victim, her testimony was unworthy of belief insofar as it implicated petitioner because she was mistaken on points such as the ownership of the "No. 1 Dad" keys, and was susceptible to police suggestion (T: 685-86). And at bottom, counsel argued, petitioner was never in the Henrichon home (T: 690). Counsel's strategy made the best use of the evidence and was reasonable.

Furthermore, as Respondent argues, trial counsel had a reasonable basis for not questioning Henrichon aggressively about her prior inconsistent statements about Velasquez, for instance, appearing to have joked around with his assailants. His decision not to confront Henrichon, as to whom the jury might feel sympathy, was a matter of strategy, as the C.P.L. §

440.10 court found, because her responses could have deflated his theory. If Henrichon had bene

presented with the opportunity to explain her answers, she likely would have nullified any impact

that the prior inconsistent statements might have afforded. In addition, that evidence would not

have served to exculpate Thompson as to the counts involving the home invasion of Henrichon.

In sum, trial counsel formulated a clear defense theory and pursued it consistently throughout

trial. I agree with Respondent that trial counsel reasonably could have concluded that the chosen

theory might have been ill-served by cross-examining Henrichon regarding her prior statements.

Under these circumstances, the Court cannot find that trial counsel's tactics, albeit unsuccessful,

amounted to ineffective assistance.

### 6.     Failure To Challenge Two Jurors "For Cause"

Thompson contends that trial counsel was ineffective for not challenging two prospective

jurors (an unidentified juror and Juror Donald S.) who allegedly stated that they were unable to

be impartial if they heard evidence that a victim was threatened with rape and death. During jury

selection, trial counsel asked the potential jurors' whether they could deliberate impartially if

confronted with a crime involved a threat of rape or death. Two venire persons (Ms. D. and Ms.

S) informed the parties that they believed themselves incapable of being impartial. Ms. D. and

Ms. S. accordingly were excused for cause. T.96-98. An unidentified male juror whose name is

not apparent also indicated that he would not be able to remain partial in a case with such

allegations. Accordingly, he also was dismissed for cause. T.102. Finally, it is not clear that

prospective juror Donald S. gave answers that would have justified a for-cause challenge. In any

event, trial counsel *did* exercise a peremptory challenge as to Donald S. T.100. However, this

attempt was thwarted by the trial court's application of a "majority rule" requirement, which it

had imposed because the case had three defense attorneys; both co-counsel opposed Petitioner's counsel's peremptory challenge to Donald S. and, consequently, Donald S. was sworn as a juror.

When Petitioner argued in his C.P.L. § 440.10 motion that trial counsel was ineffective in his handling of juror-challenges, the state court correctly noted that such a claim was without merit, "as jury selection traditionally involves matters of strategy and tactics, which are left to the discretion of the trial attorney." C.P.L. § 440.10 Order, ¶7(d) (Resp't Ex. O). As Respondent argues, the state court's ruling was a entirely consistent with federal law. *Tolliver v. Greiner*, 2005 U.S. Dist. LEXIS 32402, *18 (N.D.N.Y. Sept. 8, 2005) ("Any decision by counsel not to seek the removal of [a] potential juror through the exercise of a peremptory challenge was necessarily a strategic choice on the part of counsel."); *Doleo v. Reynolds*, 2002 U.S. Dist. LEXIS 8090, *10-11 (S.D.N.Y. May 7, 2002) ("Strategies as to the exercise of peremptory challenges are matters of counsel's intention, and do not rise to a level of constitutional error.").

### 7a.     Alleged Conflict of Interest on the Part of Trial Counsel

Petitioner claims that his trial counsel operated under a conflict of interest that precluded trial counsel from providing him with effective assistance of counsel entitled to him under the Sixth Amendment.  The C.P.L. § 440.10 court observed that although Petitioner raised the conflict of interest claim in open court and in a letter to the court, he did not raise either issue at trial or mention them in his *pro se* supplemental brief on direct appeal. The court concluded that petitioner's "self-serving allegations provide no basis for either disqualification or recusal." C.P.L § 440.10 Order, ¶7(e) (Resp't Ex.O).

The Sixth Amendment to the United States Constitution provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his

defence." U.S. Const. amend. VI. However, "the right to choose one's own counsel is not absolute." *United States v. Jones*, 381 F.3d 114, 119 (2d Cir.2004) (citing *Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988); *United States v. Locascio*, 6 F.3d 924, 931 (2d Cir.1993)). Rather, "[t]he Sixth Amendment guarantees a criminal defendant an effective advocate, not necessarily the advocate of his or her choosing." *Id.* (citing *Wheat*, 486 U.S. at 159; *Locascio*, 6 F.3d at 931). As the Second Circuit has observed, because a defendant's right to counsel of his or her choice is "not absolute," a trial court "may require" a defendant to proceed to trial with counsel not of defendant's choosing, although it "may not compel" defendant to proceed with an attorney who is "incompetent." *United States v. Schmidt*, 105 F.3d 82, 89 (2d Cir.1997); *see also United States v. Mills*, 895 F.2d 897, 904 (2d Cir.1990) (holding that an indigent defendant is not entitled to counsel of his choice; rather, he is entitled only to effective representation); *United States v. Graham*, 91 F.3d 213, 217, 221 (D.C.Cir.1996) (holding that defendant must establish prejudice to obtain reversal based on court's refusal to appoint substitute counsel). Thus, the law is clear that as a matter of both federal and state constitutional law, Thompson was not entitled to appointed counsel of his own choosing. *See Mills*, 895 F.2d at 904 (defendant wanted to represent himself at trial and retain his original attorney (who had very little experience litigating criminal matters in federal court) as standby counsel; the Second Circuit held that it was within the trial court's discretion to appoint someone other than the original attorney to act as standby counsel) (citing *United States v. Campbell*, 874 F.2d 838, 848-49 (1st Cir.1989)).

Under the Sixth Amendment, a criminal defendant is entitled to be represented by conflict-free counsel. *Ventry v. United States*, 539 F.3d 102, 110 (2d Cir.2008) (citations

omitted). An actual conflict of interest arises where (1) "the interests of a defendant and his attorney diverge with respect to a material factual or legal issue or to a course of action," and (2) this adversely affects the attorney's performance. *United States v. Williams*, 372 F.3d 96, 102 (2d Cir. 2004) (citation and internal quotation marks omitted). "To establish the adverse effect necessary to a conflict-of-interest claim, the defendant must show (1) a "plausible alternative defense strategy not taken up by counsel" and (2) the counsel's failure to undertake this strategy because of the conflict (causation). *LoCascio v. United States*, 395 F.3d 51, 56-57 (2d Cir.2005).

All Thompson has done is to attempt to transmogrify his dissatisfaction with his various assigned attorneys into an actual conflict of interest. These accusations of an attorney conflict, made prior to trial, came in the context of his repeated efforts to delay his trial. About a month before trial, the court called a conference to discuss Petitioner's letter to the court in which he claimed that counsel operated under a conflict and that counsel was ineffective for various reasons. See generally Transcript of January 18, 2001 Proceedings ("1/18/01 Tr."), attached as Exhibit X to Respondent's Exhibit R (the Petition). At the conference, after permitting Petitioner to fully state his grievances, the trial judge told Petitioner, "you have made efforts trying to delay this proceeding." 1/18/01 Tr. at 10-11. Substitution of counsel was denied.

The other allegation Petitioner makes regarding a conflict of interest is that the District Attorney and the trial judge had a "personal association" with the victim's father, whose best friend headed the Public Defender's office. However, when he asserted this alleged conflict of interest in support of his memorandum of law in support of the C.P.L. § 440.10 motion, he admitted that it was not "firmly established." (Exhibit H, Memorandum of Law, p. 40, Exhibit R, Grounds, p. 40).

The state court was justified in not substituting counsel based upon a merely speculative assertion of a conflict of interest. "[S]peculative assertions of bias or prejudice" are not sufficient to support the divergence-of-interest prong. *Triana v. United States*, 205 F.3d 36, 41 (2d Cir. 2000). Moreover, the circumstances alleged by Thompson do not establish a "conflict" such as would be constitutionally prohibited, since Petitioner's trial counsel was not affiliated with the Public Defender's office. *See* 1/18/01 Tr. at 5.

### 7b.    Failure to Move for Recusal

Petitioner next assails trial counsel for failing to move to recuse the trial judge on the basis that the trial judge was actually prejudiced against him. Petitioner contends that a witness provided him with an affidavit confirming his claim that prior to trial, the judge purported stated, in public, that Thompson was a "black young violent male from New York City and that his worst day had not come." Petitioner, Grounds for Relief, at 41. Significantly, Thompson has not provided the putative affidavit to the C.P.L. § 440.10 court or to this Court in support of his habeas petition. Although Thompson claims that he sued the trial judge for slander, he has not substantiated the claim that he instituted such a lawsuit.

As Respondent points out, Petitioner did not include this allegation against the trial judge in his letter to the court in which he discussed his counsel's alleged conflict of interest. Nor did Petitioner mention the purported slanderous statement at the pre-trial conference. It bears noting that the trial judge afforded Petitioner several opportunities to state whether he had any additional issues to raise with the court, but Petitioner did not mention this claim. 1/18/01 Tr. at 14, 16, 23. Furthermore, as the C.P.L. § 440.10 court observed, Petitioner did not mention the issue in his *pro se* supplemental brief on direct appeal. C.P.L. § 440.10 Order, ¶7(e) (Resp't Ex.

O).

The inquiry is whether "a reasonable person, knowing all the facts, would conclude that the court's impartiality might reasonably be questioned." *United States v. Pitera*, 5 F.3d 624, 626 (2d Cir.1993), *cert. denied*, 510 U.S. 1131, 114 S.Ct. 1103, 127 L.Ed.2d 415 (1994). A court considering a recusal motion must treat all of the facts alleged in a supporting affidavit as true, even if the judge has personal knowledge of their falsity. *Hodgson v. Liquor Salesmen's Union Local No. 2*, 444 F.2d 1344, 1348 (2d Cir.1971). "Mere conclusions, opinions, rumors or vague gossip are insufficient." *Id.* (citing *Berger v. United States*, supra, 255 U.S. at 34, 41 S.Ct. 230; *Simmons v. United States*, supra, 302 F.2d at 75). To be sufficient, the affidavit in support of the motion for recusal "must set forth facts, including the time, place, persons and circumstances, and, where based upon an extra-judicial statement of the judge, the substance of that statement." *Id.* (citing *Berger v. United States*, supra, 255 U.S. at 34, 41 S.Ct. 230; *Wapnick v. United States*, 311 F.Supp. 183, 184-185 (E.D.N.Y.1969)). Petitioner's allegations regarding allegedly improper comments by the trial judge "are too conclusory and speculative to provide a basis for recusal," *Herskowitz v. Charney*, 1994 WL 455172, *4 (S.D.N.Y. Aug. 18, 1994). Thus, Thompson cannot establish that trial counsel was deficient in failing to make a meritless recusal motion.

### 8.     Failure to Make an Application to Reduce the Police Presence in the Courtroom (Unexhausted Claim)

Petitioner claims that an excess of police personnel in the courtroom deprived him of a fair trial. This claim is patently without merit. "Central to the right to a fair trial, guaranteed by the Sixth and Fourteenth Amendments, is the principle that 'one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and

not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial.'" *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986) (quoting Taylor v. Kentucky, 436 U.S. 478, 485, 98 S.Ct. 1930, 1934, 56 L.Ed.2d 468 (1978)). "[T]he conspicuous, or at least noticeable, deployment of security personnel in a courtroom during trial" is not "the sort of inherently prejudicial practice that, like shackling, should be permitted only where justified by an essential state interest specific to each trial[.]" *Holbrook*, 475 U.S. at 568. "[T]he courtroom and courthouse premises are subject to the control of the court." *Sheppard v. Maxwell*, 384 U.S. 333, 358, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (quoted in *See United States v. Perez*, 2003 WL 721568, *11 (S.D.N.Y. Feb. 28, 2003)). In addition, the trial "court has broad discretion to take such steps as may be necessary and appropriate to permit the jury to concentrate on trial proceedings and to evaluate the evidence in an atmosphere free from apparent threat or danger, so long as those steps do not violate the defendant's fundamental rights." *United States v. Maldonado-Rivera*, 922 F.2d at 971. In the present case, Petitioner's fundamental rights were not infringed upon by the trial court's decision to place extra security officers in the courtroom.

Under the circumstances presented here–especially the defendants' obstreperous and disrespectful conduct in open court–the extra police presence was necessary. Petitioner had repeatedly been belligerent and disrespectful throughout the pre-trial proceedings. *See*, *e.g.*, Transcript of January 18, 2001 Proceedings. During the trial, co-defendant Madison, upset that Henrichon was about to identify him in court as an attacker, declared, "[f]uck that," told the court to "[s]hut up" several times and stated, "[h]old this in contempt of the court, my nuts, man, fuck. What type of bullshit is this?" T.368-69. Just prior to the verdict being taken, the trial court

stated:

> Before we bring in the jury, I want to talk with Mr. Madison, Mr. Russ and Mr. Thompson for a few moments. At a couple different times in the trial and prior to the trial there have been altercations of sort, notwithstanding that the Court has not been asked by the People to see that the Defendants are individually shackled and/or wearing cuffs. When the jury comes in when the verdict is rendered, whatever that might be, it's important that all of you understand that you need to conduct yourself in an orderly manner and not become disruptive or do anything that would cause injury to yourself or others. If, in fact, the verdict is not as you believe it should be, there is security here and there is a reason for that. There is a concern on the part of the Sheriff that there not be a disruption. You're obviously all aware of that. T.820-21.

Given these circumstances, the additional police presence was reasonable. It should be noted that despite the defendants' frequent outbursts and disrupting conduct, they were not shackled or handcuffed. I agree with Respondent that the courtroom safety measures employed here were reasonable and did not rise to the level of federal constitutional error. *See Holbrook*, 475 U.S. at 572 ("[E]ven were we able to discern a slight degree of prejudice attributable to the troopers' presence at respondent's trial, sufficient cause for this level of security could be found in the State's need to maintain custody over defendants who had been denied bail after an individualized determination that their presence at trial could not otherwise be ensured. Unlike a disfavored policy requiring detained defendants to wear prison garb, the deployment of troopers was intimately related to the State's legitimate interest in maintaining custody during the proceedings and thus did not offend the Equal Protection Clause by arbitrarily discriminating against those unable to post bail or to whom bail had been denied."). Therefore, even if trial counsel had protested, the objection in all likelihood would have been properly overruled and thus Petitioner was not prejudiced.

In sum, none of petitioner's largely strategy-based claims reflect any deficiency on

counsel's part. Nor can petitioner claim prejudice in the absence of a deficiency. Finally, a number of petitioner's claims simply have no basis in fact. For all of these reasons, and because the C.P.L. § 440.10 court's rejection of these claims was consistent with Strickland principles, petitioner's challenge to his counsel's effectiveness affords him no habeas relief.

### H.     Ground Eight: Verdict Against the Weight of the Evidence

Petitioner claims, as he did on direct appeal, that the verdicts were against the weight of the evidence. As Respondent points out, Petitioner's claim "relies largely on his own interpretation of the evidence and on inferences that could best be described as summation argument." Resp't Mem. at  The claim is not cognizable on habeas review. *E.g.*, *Correa v. Duncan*, 172 F. Supp. 2d 378, 381 (E.D.N.Y. 2001) ("A 'weight of the evidence' argument is a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5)"). To the extent that the claim can be viewed as an attack on the legal sufficiency of the evidence, petitioner's arguments must fail, because the evidence of petitioner's guilt was simply overwhelming.

The Due Process Clause of the Fourteenth Amendment protects a defendant in a criminal case by requiring proof beyond a reasonable doubt of every element of the crime with which he is charged. *Fiore v. White*, 531 U.S. 225, 228-29 (2001); *Jackson v. Virginia*, 443 U.S. 307, 316 (1979). A court reviewing claims of insufficient evidence must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 319 (emphasis in original); *accord*, *e.g.*, *Wheel v. Robinson*, 34 F.3d 60, 66 (2d Cir.1994), *cert. denied*, 514 U.S. 1066, 115 S.Ct. 1697, 131 L.Ed.2d 560 (1995). "Only when the record is

totally devoid of evidentiary support is a due process issue raised and habeas corpus relief warranted." *Gonzalez v. Reiner*, 177 F. Supp.2d 211, 218 (S.D.N.Y.2001); *see Bossett v. Walker*, 41 F.3d 825, 830 (2d Cir.1994); *Mapp v. Warden*, 531 F.2d 1167, 1173 (2d Cir.1976)).

A habeas petitioner "bears a very heavy burden" when challenging the legal sufficiency of his state criminal conviction, *Einaugler v. Supreme Court of the State of New York,* 109 F.3d 836, 840 (2d Cir. 1997) (quoting *Quirama v. Michele*, 983 F.2d 12, 14 (2d Cir. 1993)), and a habeas court is required to consider the trial evidence in the light most favorable to the prosecution and uphold the conviction if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319 (emphasis in original). Further, a habeas court must defer to the assessments of the evidence and credibility of the witnesses that were made by the jury and may not substitute its view of the evidence for that of the jury. *Id.*; *see also Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996); *United States v. Strauss*, 999 F.2d 692, 696 (2d Cir.1993) (citations omitted). A "conviction may be based upon circumstantial evidence and inferences based upon the evidence, and the jury is exclusively responsible for determining a witness' credibility." *Id.*

When considering the sufficiency of the evidence of a state conviction "[a] federal court must look to state law to determine the elements of the crime." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999), *cert. denied*, 528 U.S. 1170 (2000)).

Here, Petitioner was convicted of two counts of first-degree burglary and one count of second degree burglary, both of which require knowing entry into a dwelling with the intent to commit a crime therein, and the use or threatened imminent use of a dangerous instrument or the

display of a firearm (N.Y. Penal Law §§ 140.30(3), (4); 140.30(1)). He was convicted of two

counts of first degree robbery, which requires proof of forcible stealing and in the course of

committing the crime or immediate flight therefrom, the use or threatened imminent use of a

dangerous

instrument (N.Y. Penal Law § 160.15(3)) or the display of a firearm (N.Y. Penal Law §

160.15(4)).

Petitioner was also convicted of one count of third-degree robbery, which requires proof of

forcible stealing of property.

The evidence supporting Thompson's convictions was compelling. Johnson and Hobbs

testified that Petitioner and his cohorts were looking for a marijuana dealer to rob–in this case,

the designated victim was Tyler, an associate of Velasquez. Johnson's testimony that he warned

Velasquez of a possible robbery was corroborated by Velasquez's testimony that he heeded the

warning by moving his and Tyler's stash marijuana. T.330, 340, 402, 417. Johnson's and Hobbs'

testimony regarding the small-caliber gun and Johnson's testimony regarding the machete and

the tape dispenser in the Mercury Mountaineer, T.282, 325-26, 334, corroborated Henrichon's

testimony that she was accosted by a man wielding a small handgun, another man brandishing a

machete and a third, unmasked man, who she identified as Madison, who taped her legs, hands,

nose, and hair. T.350-54, 372-73. Later that night, when he pulled over the Mercury

Mountaineer, Trooper Wing observed a machete sheath in co-defendant Russ' pocket. T.485,

487. Subsequently, co-defendant Madison's fingerprint was found on the tape dispenser

recovered from the sport-utility vehicle. T.536-37, 543, 625-26, 628-31.

When considering the sufficiency of the evidence of a state conviction "[a] federal court

must look to state law to determine the elements of the crime." *Ponnapula v. Spitzer*, 297 F.3d 172, 179 (2d Cir. 2002) (quoting *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999), *cert. denied*, 528 U.S. 1170 (2000)).

Petitioner was convicted of two counts of first-degree burglary and one count of second degree burglary, both of which require knowing entry into a dwelling with the intent to commit a crime therein, and the use or threatened imminent use of a dangerous instrument or the display of a firearm (N.Y. Penal Law §§ 140.30(3), (4); 140.30(1)). He was convicted of two counts of first degree robbery, which requires proof of forcible stealing and in the course of committing the crime or immediate flight therefrom, the use or threatened imminent use of a dangerous instrument (N.Y. Penal Law § 160.15(3)) or the display of a firearm (N.Y. Penal Law § 160.15(4)). Petitioner was also convicted of one count of third-degree robbery, which requires proof of forcible stealing of property. These crimes were proven with abundant evidence. Johnson and Hobbs testified that petitioner and his cohorts sought to rob a marijuana dealer. Johnson's testimony that he warned Velasquez of a possible robbery was corroborated by Velasquez's testimony that he heeded the warning by moving his and Tyler's marijuana stash. T. 330, 340, 402, 417. Additionally, Johnson and Hobbs' testimony regarding the small-caliber gun and Johnson's testimony regarding the machete and the tape dispenser in the Mountaineer. T. 282, 325-26, 334, was corroborated by Henrichon's testimony that she was accosted by a man wielding a small handgun, another man brandishing a machete and a third, unmasked man, who she identified as Madison, who taped her legs, hands, nose and hair. T.350-54, 372-73.

The men took one or possibly two sets of keys and a necklace from Henrichon and a set of keys and a necklace with a scorpion charm from Velasquez. T: 359-60, 383, 405. Henrichon

identified the "AAA plus" keys and necklace as her own, and Rasheen Madison confessed that Velasquez had been robbed of a long silver chain bearing a scorpion charm. T.499. Torey Ronan testified that she had loaned her mother's Mountaineer to petitioner for a half hour and when the family reclaimed it a week later, it contained property not belonging to the family. T.589-90, 607-11, 623. Significantly, the Mountaineer sport-utility vehicle contained Petitioner's red sweatshirt and his identification cards, the tape dispenser, and a red bandanna. T.502-08, 565-68\. Henrichon testified that the "leader" of the gang of robbers wore a red sweatshirt and a red bandanna. T.350- 54. This evidence, as well as Sergeant Williams' testimony that Petitioner was traveling in the Ronan's Mountaineer, when Williams stopped the truck in Brooklyn, wholly served to undermine Petitioner's claim that he spent the evening with Jacqueline Rowe, who allegedly drove him to Newark, New York in her mother's van. T.639-42.

Thus, there was abundant, credible evidence that Petitioner and his cohorts forced their way into Henrichon's home, tied her up, stole her property, placed a machete to her throat and threatened to "pop a cap" in her. Henrichon's testimony was corroborated by Velasquez's testimony that he saw Henrichon tied up, T.361, 406, and Foss' testimony that one attacker tried to convince him and Brian Tyler to enter the house and that he subsequently saw the lights in the home go off and was unable to reach Henrichon by telephone, T.360, 403, 419, 432-35. Henrichon's description of the crime was also corroborated by Sergeant Thoms' recovery of a machete, wadded tape and three damaged telephones. T.460-63. Subsequently, Madison's fingerprint was found on the tape dispenser. T.536-37, 543, 625-26, 628-31.

Later that night, Trooper Wing observed a machete sheath in co-defendant Russ' pocket. T.485, 487, which corroborated Johnson's and Hobbs' testimony that Petitioner and his cohorts

had a machete in the Mercury Mountaineer, as well as Henrichon's testimony that one of her attackers wielded a machete. This evidence was more than legally sufficient to prove the robbery and burglary charges, T.350-54, 372-73, with regard to Henrichon. Furthermore, the overwhelming credible evidence established beyond a reasonable doubt that Petitioner, Madison and Russ concocted a plan to rob a marijuana dealer using a gun, a machete, and tape; that they robbed Henrichon and Velasquez later that night; that they then drove Sheryl Ronan's Mercury Mountaineer vehicle to New York City; and that they were caught with some of the robbery proceeds and their robbery clothing and bandanna-mask still in the car.

Even if a legal insufficiency claim were fully exhausted and properly before the Court, the Court would be compelled to reject it as unmeritorious. A rational trier of fact had more than ample evidence to find that the prosecution had proven Thompson's culpability beyond a reasonable doubt.

## V. Petitioner's Second Motion to Amend, Declaration of Facts in Opposition to Respondent's Memorandum of Law, and Motion to Expand the Record

During the pendency of the Petition, Thompson filed what he denominated an "Amended Petition," (Docket No. 44), which this Court treated as a Second Motion to Amend the Petition. Respondent was directed to submit responsive pleadings to Thompson's "Amended Petition,"(Docket No. 45).[5]

In addition to his Second Motion to Amend (Docket No. 45), Thompson filed a Motion to

---

[5] This is actually Petitioner's second Motion to Amend. The first was filed on September 13, 2007, about 9 months after Respondent filed his initial Answer in opposition to the Petition Thompson sought to add the following claims in the First Motion to Amend (Docket No. 31): (a) denial of the right to appeal from a complete lower court record; (b) ineffective assistance of trial counsel based on a conflict or interest; and (c) ineffective assistance of counsel based upon the failure to object with the prosecutor allegedly failed to abide by a stipulation. This First Motion to Amend was denied on the basis that the proposed amended claims did not "relate back" to the original Petition for purposes of FED. R. CIV. P. 15(c). *See* Docket No. 37.

Expand the Record (Docket No. 46), along with a Declaration of Facts in Opposition to Respondent's Memorandum of Law (Docket No. 47).

Respondent then filed a Response in Opposition to Petitioner's Motion to Amend and Motion to Expand the Record. (Docket No. 47). Petitioner submitted a Reply in Opposition to Respondent's Response. (Docket No. 48).

Respondent has opposed the "Declaration of Facts", the Motion to Expand the Record, and the Motion to Amend. *See* Respondent's Declaration in Opposition to Petitioner's Motions ("Resp't Opp. Decl.") (Docket No. 47). Respondent has requested that the Court strike Petitioner's Declaration of Facts in Opposition to Respondent's Memorandum of Law in Opposition to the Petition, on the bases that it is untimely and is not a proper pleading in a habeas corpus proceeding. Resp't Opp. Decl., ¶1 (Docket No. 47).

In opposition to Petitioner's "Declaration of Facts", Respondent argues that the pleading is construed as a Reply or a Traverse, it should be stricken because Respondent filed his memorandum of law in November 2006, three and a half years before the filing of Petitioner's Declaration of Facts. This filing is therefore untimely under the Scheduling Order and the Federal Rules of Civil Procedure generally.  I agree with Respondent that it should be stricken. Nevertheless, because Thompson is proceeding *pro se*, the Court did consider his Declaration of Facts in Opposition to Respondent's Memorandum of Law in reporting on the instant Petition. However, the Declaration simply represents Thompson's disagreement with the proper way to view the evidence, rather than the "correct", set-in-stone version of the facts. The Court finds credible and accurate Respondent's view of the facts as established by the overwhelming proof at trial, notwithstanding Petitioner's protestations throughout all of his pleadings that Respondent is

essentially lying.

I turn next to the Second Motion to Amend. After carefully reviewing the pleadings in view of the applicable law concerning motions to amend habeas petitions, the Court recommends finding that Thompson's Motion to Amend and Motion to Expand the Record be denied. In his Second Motion to Amend, Thompson states that through his "continuous diligents [sic]" he has discovered that the prosecutor "has suppress[ed] more exculpatory information in this case." Second Motion to Amend, ¶13 (Docket No. 45). In the attachments to the Second Motion to Amend, Thompson asserts that he has been on a "chase" for criminal records of Robert Johnson whom Thompson claims that he never met. Second Motion to Amend at p. 7 (Docket No. 45). According to Thompson, Johnson had previously been convicted of attempted robbery which occurred about two hours before the Henrichon home invasion, and that Johnson also had several "juvenile delinquent charges" that could have been used at trial in a "swearing match"–that is, in order to impeach Johnson's credibility. *Id.* at p. 10 (citing *United States v. Seijo*, 514 F.2d 1357 ( Cir.)) (Docket No. 45); *see also id.* at 13-15 (Docket No. 45). With regard to the alleged "juvenile delinquent" charges, Petitioner has not provided particulars as to these convictions.

Because Respondent has already answered the petition, Petitioner may only amend the petition by leave of court. FED. R. CIV. P. 15(a); Rule 11 of the Rules Governing Section 2254 Cases. I agree with Respondent that Petitioner's second motion to amend should be denied. As Respondent points out, Petitioner has provided no proof that this proposed claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1967), has been exhausted in state court pursuant to the dictates of 28 U.S.C. § 2254(b)(1). Although Petitioner claimed in the original petition that his counsel was ineffective for not objecting to Johnson's invocation of his right

against self-incrimination, Petitioner made no stand-alone *Brady* claim with regard to the prosecution's disclosure obligations in connection with Johnson's criminal history. The Second Circuit has indicated "that a claim of ineffective assistance of appellate counsel is 'distinct' from the claim whose omission indicates such ineffectiveness." *Jones v. Senkowski*, 42 Fed. Appx. 485, 486-87, 2002 WL 1032589, at **1 (2d Cir. May 22, 2002) (unpublished opn.) (citing *Turner v. Artuz*, 262 F.3d 118, 123 (2d Cir.) ("[A] petitioner cannot show exhaustion unless he has 'fairly presented to an appropriate state court the same federal constitutional claim that he now urges upon the federal courts.' *Klein v. Harris*, 667 F.2d 274, 282 (2d Cir.1981). The only constitutional claim Turner was permitted to raise in seeking a writ of error coram nobis was ineffective assistance of appellate counsel, a claim that is distinct from claims (1) and (2) in procedural terms under state law and in their federal constitutional sources. A court considering ineffective assistance might never reach the underlying constitutional claims, and the rejection of the ineffective assistance claims without detailed comment does not bespeak any necessary ruling on the underlying constitutional claims."), *cert. denied*, 534 U.S. 1031, 122 S.Ct. 569, 151 L.Ed.2d 442 (2001).

The Court need not delve further into the intricacies of exhaustion and procedural default because the motion to amend may decided on the basis that adding the claim would be futile. The Supreme Court has stated that "[i]n the absence of any apparent or declared reason-such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.–the leave sought should, as the rules require, be 'freely given.'" *Forman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)); *see*

*also Nerney v. Valente & Sons Repair Shop*, 66 F.3d 25, 28 (2d Cir.1995) (*per curiam*)

("Because it would be possible for Nerney to prevail on an ERISA fiduciary claim at trial, the

district court erred in concluding that amendment would be futile, and denial of leave to amend

was therefore an abuse of discretion. *See Cortec Indus. v. Sum Holding L.P.*, 949 F.2d 42, 50 (2d

Cir.1991) (finding it an abuse of discretion to deny leave to amend where amendment could cure

a defect in the complaint and thus would not be futile); *cf. S.S. Silberblatt, Inc. v. East Harlem

Pilot Block-Bldg. 1 Hous. Dev. Fund Co.*, 608 F.2d 28, 42 (2d Cir.1979) (reversing denial of

leave to amend where "the alleged futility of the amendment rests on findings of fact").

　　As discussed below, Thompson's proposed *Brady* claim is patently without merit. To

summarize, Petitioner's *Brady* claim is that prosecutor failed to provide all of Johnson's criminal

history. In particular, there is a charge of fifth degree criminal conspiracy that Thompson claims

was withheld from the defense. However, this is belied by the record. As Exhibits to the Second

Motion to Amend, Petitioner has submitted his request (Exhibit A) for a copy of the transcript

from Johnson's sentencing in Geneva City Court (Criminal Branch) on a charge of fifth degree

conspiracy in satisfaction of the attempted robbery charge, along with the transcript itself

(Exhibit B). *See* Docket No. 45. Also submitted was the prosecutor's C.P.L. § 240.45(1) Notice

dated February 2, 2001, detailing the record of the judgment of convictions and/or pending

criminal actions against prosecution witnesses Hobbs and Johnson. Included in the C.P.L. §

240.45(1) Notice with regard to Johnson are a conviction in December 2000 in Geneva City

Court for criminal conspiracy in the fifth degree and pending charges in Chemung County Court

and Tompkins County Court for third degree robbery and second degree gang assault,

respectively. The fifth degree criminal conspiracy claim–which Thompson contends was

withheld or suppressed–had not reached resolution at the time of trial, since Johnson had not yet been sentenced as illustrated by the sentencing minutes provided by Petitioner with his Second Motion to Amend (Docket No. 45).

When questioned at Petitioner's trial about these criminal matters that had not been resolved, Johnson properly invoked his Fifth Amendment privilege against self-incrimination. Thus, as demonstrated by the trial minutes and the C.P.L. § 240.45(1) Notice, the prosecutor did not withhold or suppress any information regarding Johnson's pending and resolved criminal convictions. Rather, the prosecutor fulfilled the statutory and due process requirements of notifying the defense of the prosecution witnesses' criminal records. The only reason defense attorneys were precluded from cross-examining Johnson about certain unresolved criminal matters was Johnson's proper invocation of his Fifth Amendment rights.

Amendment would be futile as Petitioner cannot fulfill at least one of the *Brady* prerequisites–suppression. As the Supreme Court has explained many times, there are "three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *accord, e.g.*, *Boyette v. Lefevre*, 246 F.3d 76, 89 (2d Cir.2001). Therefore this Court recommends that leave to amend the petition to include this claim should be denied. *See Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990) ("[W}here, as here, there is no merit in the proposed amendments, leave to amend should be denied. *Friedman v. Chesapeake & Ohio Ry. Co.*, 261 F. Supp. 728, 734 (S.D.N.Y.1966), *aff'd as to this point on opinion below*, 395 F.2d 663, 664 (2d Cir.1968) (*per curiam*), *cert. denied*,

393 U.S. 1016, 89 S.Ct. 619, 21 L.Ed.2d 561 (1969); *Love v. New York State Dep't of Environmental Conservation*, 529 F. Supp. 832, 845 (S.D.N.Y.1981).")).

Finally, I turn to Petitioner's Motion to Expand the Record. The additional documentation appears to relate to his claim that there was an incomplete appellate record. *See* Docket No. 46. According to Thompson, there was a "misrepresentation" that he appeared in court on one date prior to trial while he actually appeared in court on a different date. The Court does not see how this record-keeping error–if error it was–has any effect on any of the claims raised in the Petition. Respondent points out this claim bears relevance, at most, to Petitioner's proposed claim, from the First Motion to Amend, that his direct appeal was heard on an incomplete record. As noted above, the First Motion to Amend was denied. The correspondence attached to Petitioner's Motion to Expand the Record appears to be mostly administrative in nature, as Respondent points out, though admittedly it does include an error by a court reporter that Respondent's habeas counsel represents Petitioner, which is obviously not the case. Respondent's habeas counsel states that she does not know if that was an error on that writer's part or the product of a misrepresentation. In any event, I agree with respondent that the record "should not be expanded to include materials that have nothing to do with the validity of petitioner's conviction, let alone the merits of the claims that are properly before this Court." Even if the Record were expanded to include these documents, they have absolutely no bearing on the merits of Thompson's Petition. Accordingly, I recommend that the Motion to Expand the Record be denied.

## VI.    Conclusion

For the foregoing reasons, I recommend that the Petition for a writ of Habeas Corpus filed by Shamgod Thompson be dismissed. I further recommend that Petitioner's Second Motion to

Amend, Declaration of Facts in Opposition to Respondent's Memorandum of Law, and Motion to Expand the Record be denied. Finally, I recommend concluding that no certificate of appealability should issue with respect to any of Thompson's claims as, in this Court's view, he has failed to make a substantial showing of the denial of a constitutional right. *See* 28 U.S.C. § 2253(c)(2).

/s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: January __, 2010
Buffalo, New York.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED**, that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report and Recommendation in accordance with the above statute, Fed. R. Civ. P. 72(b) and Local Rule 72.3(a)(3).

The District Court ordinarily will refuse to consider on *de novo* review arguments, case law and evidentiary material which could have been, but was not, presented to the Magistrate Judge in the first instance. *See*, *e.g.*, *Patterson-Leitch Co., Inc. v. Massachusetts Municipal Wholesale Electric Co.*, 840 F.2d 985, 990-91 (1st Cir. 1988).

**Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.** *Thomas v. Arn*, 474 U.S. 140 (1985); *Wesolek v. Canadair Ltd.*, 838 F.2d 55 (2d Cir. 1988); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72, 6(a), 6(e).

The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." **Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Decision and Order), may result in the District Court's refusal to consider the objection.**

Let the Clerk send a copy of this Order and a copy of the Report and Recommendation to petitioner and respondent.

-64-

**IT IS SO ORDERED.**

/s/ Victor E. Bianchini

_____
VICTOR E. BIANCHINI
United States Magistrate Judge

Dated: January 4, 2011
Buffalo, New York